**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TIPSY NAIL CLUB LLC, on behalf of itself and all others similarly situated,<br><br>          Plaintiff,<br><br>     v.<br><br>CLASSPASS INC., FRITZ LANMAN, and PAYAL KADAKIA,<br><br>          Defendants. | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Civ. No. 21-8662 |

Plaintiff Tipsy Nail Club LLC ("Plaintiff" or "Leeah Nails"), on behalf of itself and all others similarly situated, brings this class action suit for damages and equitable relief against Defendant ClassPass Inc. ("ClassPass"), its CEO Fritz Lanman, and its Founder and Executive Chairman Payal Kadakia (the "Individual Defendants," and together with ClassPass, "Defendants"). Plaintiff alleges the following based upon personal information as to allegations regarding itself, on its own investigation, and the investigation of its counsel, and on information and belief as to all other allegations:

**NATURE OF THE ACTION**

1.      ClassPass dubs itself "The app for all things fitness, spa & beauty."  It operates an online platform that allows its customers, who purchase the Company's membership subscriptions (the "ClassPass Subscribers"), to book classes at gyms and fitness studios, and, more recently, "wellness appointments" such as manicures, pedicures, massages, or haircuts from salons and spas.

2.     ClassPass purportedly has a vast network of businesses that partner with them (the "ClassPass Partner Network") throughout the United States. ClassPass Subscribers use their memberships to purchase and book services with the businesses on the ClassPass Partner Network.

3.     ClassPass promotes the size of its ClassPass Partner Network to (a) attract more customers to purchase ClassPass memberships, (b) entice other businesses to choose to partner with it, and (c) to sell corporate-wellness programs to major corporations that wish to purchase memberships as an employee benefit.

4.     Plaintiff operates a nail salon in New Jersey and never partnered with ClassPass.  However, when a customer attempted to use a service that it had booked through ClassPass, Plaintiff discovered that ClassPass had listed Plaintiff's business and service offerings as part of the ClassPass Partner Network, without Plaintiff's knowledge or consent.

5.     Further investigation by Plaintiff and its counsel revealed that ClassPass has countless false listings of businesses that never partnered with it.

6.     In sum, Defendants have engaged in a course of conduct with respect to the advertising of its ClassPass Partner Network that unfairly and falsely affiliates Plaintiff and class members with Defendants, which, among other harms, diverts potential customers into purchasing ClassPass memberships instead of directly purchasing services that Plaintiff and the class members offer.

7.     Accordingly, Plaintiff brings this class action on behalf of itself and all other similar entities for unfair competition, false affiliation, and false advertising

under federal and state law.  In addition to monetary relief, Plaintiff seeks to prevent Defendants from continuing to misappropriate and trade upon the goodwill and business reputation of Plaintiff and the class members by falsely, and without their consent, listing their businesses on ClassPass's website and mobile application.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; the number of members of the proposed Classes exceeds 100; and many members of the proposed Classes are citizens of different states than the Defendant.

9.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1332(a)(1).

10.     This Court has personal jurisdiction over Defendant ClassPass Inc. because Defendant is headquartered in the State of New York, regularly conducts business in this Judicial District, and has extensive contacts with this forum.

11.     This Court has personal jurisdiction over the Individual Defendants because they regularly conduct business in this Judicial District, and have extensive contacts with this forum.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants transact substantial business in this District.

13.     This Court has supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367.

## THE PARTIES

**A.    Plaintiff**

14.    Plaintiff Tipsy Nail Club LLC ("Plaintiff or "Leeah Nails") is a New Jersey limited liability corporation.  It operates under the name "Leeah Nails" and is located in Montclair, New Jersey.  It has served thousands of clients, received countless great reviews, and applies the newest techniques and technologies in providing manicures, pedicures, and bridal nails services.

**B.    Defendants**

15.    Defendant ClassPass Inc. is incorporated in Delaware and maintains its principal place of business at 257 7th Ave, New York, New York.  According to LinkedIn, Defendant has over 500 employees, with some 20% of those located in New York.  Defendant is registered to do business in New York and does business throughout the United States and some thirty countries worldwide. It claims it has over 50,000 partner businesses in its ClassPass Partner Network.

16.    Defendant Fritz Lanman is the CEO of ClassPass.  He started at ClassPass in 2013 and formerly served as the Company's Executive Chairman.  He transacts substantial business in New York.  At all relevant times, Defendant Lanman was the moving, active, and conscious force behind the unlawful actions of ClassPass, as alleged herein, and as an officer of the Company controlled, authorized, directed, and approved this misconduct.  Lanman has also personally and individually falsely promoted the size of the ClassPass Partner Network.

17.    Defendant Payal Kadakia is the Founder and Executive Chairman of ClassPass.  She transacts substantial business in New York.  At all relevant times,

Defendant Kadakia was the moving, active, and conscious force behind the unlawful actions of ClassPass, as alleged herein, and as an officer of the Company controlled, authorized, directed, and approved this misconduct.  Kadakia has also personally and individually falsely promoted the size of the ClassPass Partner Network.

## C.   Related Third Parties

18.     Mindbody Inc. is a California-based software as-a-service company that provides software tools to gyms, fitness studios, salons, and spas.  In the spring of 2021, Mindbody was in talks to acquire ClassPass.  At least as of April 30, 2021, MindBody has promoted the size of the ClassPass Partner Network on its website.  On October 13, 2021, Mindbody announced it would acquire ClassPass.

19.     ClassPass has raised $550 million in a series of fundings over the past decade, including some $285 million it raised on January 8, 2020.  Certain venture capital funds have repeatedly invested in ClassPass's operations, and the investors intend to remain with ClassPass post-Mindbody's acquisition.  Temasek Holdings, General Catalyst, Thrive Capital, GV, and Apax Digital are among the company's investors.

## FACTUAL ALLEGATIONS

## A.   ClassPass – A Marketplace Connecting Customers to Gyms, Spas, and Salons

20.     Founded in 2012, ClassPass started in two countries and originally focused on connecting fitness studio owners to consumers who wanted to book fitness classes.  ClassPass now operates in thirty countries and has broadened its business model to include the wellness and beauty industries.

21.     ClassPass grew quickly in its early years, with revenues jumping from $200,000 in 2014 to a projected $122 million in 2016.

22.     By March 2019, ClassPass Subscribers had booked more than 65 million classes or services using ClassPass.

23.     ClassPass has also raised $550 million in a series of fundings over the past decade, including some $285 million it raised on January 8, 2020.  Based on the funding it received in January 2020, ClassPass achieved a $1 billion valuation.

24.     A few months later, however, the COVID-19 pandemic ground ClassPass to a near halt when people stopped going to gyms.  As a result, in May 2020, ClassPass laid off or furloughed 53% of its staff and lost 95% of its weekly revenue.

25.     Nonetheless, ClassPass quickly adapted.  As related in a June 23, 2020 interview with ClassPass CEO Defendant Fritz Lanman, within 10 days of the COVID-19 lockdowns, ClassPass implemented a live streaming option so that gym studios could stream classes and monetize that content.  Lanman also glowed about the Company's expansion into thirty countries and asserted that ClassPass "ha[s] a lot of wind in [its] sales," because of market trends in favor of "health and wellness or finding group fitness," and because "the industry desperately needs an aggregator."

26.     In a September 15, 2020 interview, Lanman doubled down on his optimism for ClassPass, highlighting the Company's flexibility and adaptability, which included live streaming and features for gyms to showcase their COVID-19 safety measures.

27.     He also emphasized that ClassPass had been "bulk[ing] up salon and spa services" to weather the pandemic, explaining: "By adding wellness and beauty and additional digital experiences like one-to-one personal training, we've expanded our product portfolio and the different ways that you can get value from ClassPass. That protects us from COVID in a prolonged situation."

28.     In a September 9, 2021 article, CEO Lanman explained that the company was hedging its bets by expanding into wellness and beauty and setting up corporate-wellness programs for large companies.  Lanman also claimed that half of Americans are located near at least five ClassPass-affiliated studios.  Furthermore, Lanman reported that that since June 2021, 90% of the company's customers are back to active—i.e., paying—subscriptions.

29.     In an interview with Forbes on October 13, 2021, Founder and Executive Chairman Defendant Payal Kadakia boasted about ClassPass's expansion into the wellness industry as a sign of its resilience after COVID-19, explaining: "We started launching new products like wellness on there . . .  and the company is bigger and stronger because of it."

30.     In promoting the Forbes interview on LinkedIn, Defendant Kadakia highlighted Defendant Lanman's efforts in ClassPass's success, writing: "Big thank you to the incredible ClassPass Team, especially Fritz Lanman."

31.     ClassPass's ostensible success has only continued.  Reports surfaced in May 2021 that it was in merger talks with Mindbody Inc., a company which provides software tools to gyms, fitness studios, salons, and spas.

32.     Then, on October 13, 2021, ClassPass announced that Mindbody was acquiring ClassPass.  Mindbody also announced that global asset manager Sixth Street would invest $500 million in the post-merger company.

33.     In praising the deal, Mindbody CEO Josh McCarter emphasized the value of ClassPass's supposed "huge network of wellness businesses"—businesses MindBody might now have more leverage to persuade to use its software to help manage bookings.

34.     That same day, Defendant Lanman further boasted about ClassPass's resilience after COVID-19, crediting the Company's expansion into other business lines:  "Over the past year, ClassPass has considered many paths forward including independent options that valued our business at a significant uptick since our previously confirmed January 2020 valuation of over $1 billion."

35.     After the merger is complete, Defendant Lanman will become the president of the merged-companies' marketplace unit.  Defendant Kadakia will then cease her active involvement in ClassPass.

**B.     ClassPass's Current Business Model and Its Reliance on Its Purportedly Broad Partner Network**

36.     ClassPass falls into the category of internet platforms known as "digital middlemen," which are participants in a two-sided market where buyers and sellers are intermediated by an online platform.  With the rise of the internet, digital middlemen are increasing in importance, by creating newly accessible databases to a wide audience.

37. The goal of a two-sided market is to connect consumers and producers to each other, while reaping profit from both. Digital middlemen, like DoorDash and InstaCart, often corner a market by offering below-market prices, while providing an attractive quantity of potential users to sellers. These digital middlemen generate revenue by taking a commission from each sale or subscription.

38. ClassPass is one such digital middleman and operates in a two-sided market. Because ClassPass is the intermediary between its subscribers (customers who want to book gym classes or beauty appointments) and its partners (the companies offering the services), the number of participants on one side affects the number of participants on the other. As economists Thomas Eisenmann, Geoffrey Parker, and Marshall W. Van Alstyne explain in the Harvard Business Review,

> The two groups are attracted to each other — a phenomenon that economists call the network effect. With two-sided network effects, the platform's value to any given user largely depends on the number of users on the network's other side. Value grows as the platform matches demand from both sides.

39. ClassPass Subscribers pay for a monthly subscription, which varies by location but generally ranges from $15 to over $200 a month. The subscribers then receive credits, which they use to book services from businesses that partner with ClassPass (the "ClassPass Partners").

40. Businesses, such as gyms or salons, can partner with ClassPass, which allows the subscribers to book their services. ClassPass generally takes a 5% commission from services that ClassPass Subscribers book with businesses in its Partner Network.

41.     To attract new members, ClassPass engages in a variety of marketing strategies.   Prominently, ClassPass touts the wide reach of the ClassPass Partner Network. For instance, it claims that its members can "[a]ccess thousands of gyms, fitness studios, and wellness centers with one easy-to-use app."  In fact, this claim of offering "thousands" of gyms, studios, and centers is plastered across its website; in ClassPass's "Common Questions" section, the question, "Where can I use my ClassPass credits?" is answered with, "Short answer, thousands of places."

42.     As of the date of this Complaint, ClassPass also offers a free trial membership, advertising: "Try ClassPass for access to thousands of gyms, fitness studios, salons and spas, all for free."

43.     ClassPass further brags that customers can "[u]se your membership in 2,500 cities worldwide" and that they get "special rates," such as an average savings of "30% off the average price of a fitness class."

44.     ClassPass, in turn, entices gyms and spas by promising that a partnership will connect them to ClassPass Subscribers.  ClassPass asserts that it takes businesses less than 10 minutes to sign up and upload their classes and services, and that by doing so, these businesses can "[t]ap into new audiences and reach thousands of ClassPass customers in your area."

45.     In addition, ClassPass tries to convince businesses to join the ClassPass Partner Network because, supposedly, a lot of other businesses have already chosen to partner with them.   For instance, it boasts: "Studios of all sizes partner with

ClassPass.  Whether you're an established studio or just starting out, you'll be in good company."

46.    Historically, ClassPass has also offered additional perks and incentives, such as a $20,000 sign-on bonus, to get studios to join the ClassPass Partner Network.

47.    Mindbody, which announced that it would acquire ClassPass in October 2021, hosts ClassPass on its partner-store website and also leverages the purported size of the ClassPass Partner Network to entice other businesses to sign-up:

> ClassPass is the world's leading fitness and wellness network. By listing your livestream and in-person classes and appointments on ClassPass, you can reach new users — wherever they may be — and maximize your revenue. ***Join over 50,000 health and wellness partners around the world growing their businesses on ClassPass***.

48.    ClassPass also touts the reach of its Partner Network to promote its corporate-wellness program, which it advertises to companies that seek to provide memberships as an employee benefit.   ClassPass's corporate-wellness partners include major corporations such as United Airlines, T-Mobile, Walgreens, Southwest, AT&T, American Airlines, Aetna, Refinery29, and PetCo.   ClassPass claims that

**Give your employees the best in fitness & wellness**

ClassPass corporate plans provide employees with the ultimate flexibility. Employees get access to over 41,500 fitness studios, gyms and wellness options worldwide. Plans are month-to-month with no annual commitments. And employees save by only paying for employees who sign up.

corporate "[e]mployees get access to over 41,500 fitness studios, gyms and wellness options worldwide."

49.    Although ClassPass advertises itself as a tool for businesses to find additional customers and increase revenue, for many studios, joining the ClassPass Partner Network has been financially disastrous.  For example, as reported in Vice, *ClassPass Is Squeezing Studios to the Point of Death* (Feb. 6, 2020),[1] ClassPass has driven down the rates at which studios offer their services to below sustainable levels, yet the size of ClassPass's customer base forces these businesses to continue their partnership with ClassPass.  Businesses eventually have no choice but to accept ClassPass's reduced rates because they cannot compete with ClassPass to attract customers separately.  In the words of one studio, ClassPass has created a situation for ClassPass partners where "we are damned if we do and damned if we don't."

50.    Indeed, ClassPass acts more like a competitor than a partner to those in the ClassPass Partner Network.  As Vice explained:

> [A]fter wiggling its way inside thousands of studios, the system had nonetheless begun to seem like . . . not so much a partner as a competitor—one that had control over the rules of the game. . . . On its website, ClassPass proudly boasts that customers can 'save up to 70% off drop-in rates.' "'Sweat your workouts – not their prices,'" the company says.
>
> Meanwhile, ClassPass partners can't make the same comparisons.  The company makes partners agree that the terms of their deals "will never be visible to ClassPass users," according to one partner agreement, and requests that partners never target ClassPass customers with promotions, "undercut ClassPass pricing" or "make any

---

[1] https://www.vice.com/en/article/xgqgaw/classpass-is-squeezing-studios-to-the-point-of-death

comparative references to ClassPass," according to its terms and conditions.

51.     ClassPass has also taken customers from the studios that partner with it.  For instance, customers that previously booked classes directly from studios now use ClassPass to book the same classes because of ClassPass's discounted rates.  In the words of one business owner, "[ClassPass has] taken control . . . essentially renting out spots in our classes and making the customers their customers, not our customers."

52.     Like businesses in the ClassPass Partner Network, who signed up with optimism based on ClassPass's promises of increased customer reach, ClassPass subscribers are also widely unhappy with the Company.

53.     It appears that shortly after June 2021, when Defendant Lanman announced that 90% of ClassPass subscribers had resumed paying for their subscriptions—as these memberships had been paused in Spring 2020 due to COVID-19—hordes of ClassPass members were unaware that the charges had restarted.

54.     ClassPass has a two-star rating on Trustpilot.com, based on 6,945 reviews, with numerous reviews around September 2021 from customers reporting that they discovered ClassPass started charging them again for subscriptions they believed had been canceled or paused.  For example, on September 26, 2021, one customer related:

> ***Same exact bull as everyone else on here***. At the start of the pandemic I tried to cancel my classpass plan for obvious reasons... with no luck. The best I was able to do was "pause my account" and get 0 credits for 0$ a month. Sometime in May they started charging my account again... didn't notice until last month when I finally logged

on and canceled - only to see that they charged me AGAIN this month. I will go through my credit card company and most likely get the money back because I saved all the documentation (thankfully), but a huge hassle and NOT what I want to spend my Sunday doing. The fact that everyone else has been having the same problem is more than a coincident [sic].

55.     Complaints to the Better Business Bureau—where ClassPass has a dismal 1.18 rating—also relate the same experiences of unwanted charges and bills. So too on Yelp and at least two other complaint forums, www.sitejabber.com and www.complaintsboard.com.

### C.   ClassPass Misappropriates Businesses' Names and Services to Falsely Exaggerate the Size and Reach of the ClassPass Partner Network

56.     On September 1, 2021, a customer came to Plaintiff Leeah Nails's store and received the "Gel Manicure and Spa Pedicure" service.

57.     After she received the service, Leeah Nails asked for payment. However, the customer was confused, claiming she had already paid for the service because she booked it using ClassPass.

58.     The customer's booking confirmation on her phone demonstrated that she used 16 credits to book the service.  ClassPass only advised her that gratuity was not included:



59.    Leeah Nails did not have any relationship with ClassPass and was confused as to how this customer could have purportedly booked this service.

60.    Leeah Nails's online booking system showed that a reservation had been made for this customer, but that there was no prepayment.

61.    Leeah Nails apologized to the customer for the confusion and charged her the regular price of service.  The customer was upset but paid in full.

62.    The customer shared this experience in an online complaint forum:



63.     Later, Leeah Nails attempted to call back the customer on the number that was used to reserve the service on its online booking platform.  However, this phone number went directly to a ClassPass employee.

64.     Leeah Nails also discovered ClassPass had listed it on the ClassPass Partner Network, and even listed Leeah Nails's service offerings and a schedule.

65.     Leeah Nails's listing on ClassPass has a generic description and contains the nail salon's various services, with an option to click "See Pricing" next to each service.



66.     When clicking on "See Pricing," next to the appointment, the website redirects not to Leeah Nails's price list, but instead to the ClassPass membership sign-up page:



67.     ClassPass's mobile application contains a similar listing for Leeah Nails:



68.     Within the application, clicking on the schedule shows a service list and purportedly available appointment times.



69.     The application promotes these appointments' availability to encourage new customers to "Start trial" or for prior customers to "Reactivate" their memberships.




70.     Leeah Nails did not write the description of its business that is displayed on ClassPass, nor did it ever upload its appointment schedule.   Indeed, the appointment slots that ClassPass lists as being available are false and inaccurate— Leeah Nails does not schedule services for every half hour, and ClassPass shows available time slots that have already been booked.

71.     Leeah Nails contacted ClassPass customer service multiple times, but they refused to assist on the grounds that Leeah Nails did not have an account with ClassPass.

72.     The owner of Leeah Nails quickly discovered that countless other businesses had similar generic descriptions on ClassPass.   The owner spoke to five other businesses with the same descriptions, and confirmed that none had any relationship with ClassPass.   Indeed, all five other businesses were unaware that ClassPass was listing their businesses and services.

73.     Upon further investigation, Plaintiff discovered dozens of businesses in at least 20 different states whose services were being listed on ClassPass without their knowledge or consent.

74.     On information and belief, ClassPass falsely lists thousands of businesses that are not actually partnered or affiliated with ClassPass on its marketplace as part of the ClassPass Partner Network.

75.     A tell-tale sign of the false listings is that the supposed descriptions of these businesses on ClassPass are all generic and essentially the same.   ClassPass's

false listings display stock photos and contain these paragraphs, essentially verbatim:

> **[Facial Spas/Hair Salons/Massage Spas/category of business]** are busy and wait times can be unpredictable. But getting pampered shouldn't be stressful. With ClassPass, select your preferred time and service, book online, and pre-pay using credits.
>
> . . .
>
> PLEASE READ
>
> Gratuity is not included in your reservation. Please remember to tip based on the full amount of the service reserved. Additionally, ClassPass user is responsible for any enhancements or additional services requested during the appointment.
>
> Photos are stock - please visit **[business website]** for more information.

76.     ClassPass appears not to edit these listings for grammar:



77.     There are thousands of falsely listed ClassPass Partners online. And just a simple search of the ClassPass website demonstrates that in all major markets, and even smaller locations, ClassPass contains dozens of false listings of partners. The following illustrates results for just a small selection of available ClassPass "partners" in New York, Seattle, Los Angeles, Chicago, and Austin:

(a)  New York, New York          (b) Seattle, Washington





(c) Los Angeles, California

(d) Chicago, Illinois





(e) Austin, Texas



78.     Plaintiff Leeah Nails has never consented, and still does not consent to Defendants' use of its business information and list of services.

79.     Plaintiff Leeah Nails is concerned for injuries to its reputation. ClassPass has poor ratings online, and consumers are reporting that ClassPass is charging for memberships without consent.  Leeah Nails does not want the public to believe that it is associated with ClassPass in any way.

80.     Although the customer that came to Leeah Nails from ClassPass ultimately paid full price for the service, Leeah Nails does not want customers to have

a negative experience at its business. Indeed, the disgruntled customer has not returned for additional services, and the negative review that was posted about Leeah Nails as a result has likely dissuaded other would-be customers from seeking out its services.

81.     Leeah Nails fears that ClassPass is taking away potential customers. Individuals that are interested in booking Leeah Nails's services may click to register through ClassPass. ClassPass uses this as an opportunity to sell ClassPass memberships.

82.     Leeah Nails also fears that it will be forced to use ClassPass to survive to attract customers, and as a result, ClassPass will drive down its margins for services below sustainable rates. Leeah Nails is concerned that the false listing of hundreds of partners in the ClassPass Partner Network will eventually force it to sign up with ClassPass or risk losing customers who wish to use ClassPass to book services because of the wide offerings of the ClassPass Partner Network.

83.     Other businesses that ClassPass falsely lists as part of its network share these concerns. For instance, a spa owner went online to complain about ClassPass falsely listing its business, explaining that it "never joined class pass" but "people are buying my spa pedicure services through this."[2]

---

[2] https://gethuman.com/issue/ClassPass/lucx/i-never-joined-class-pass-people-are-buying-my-spa-pedicure-services-through-this-I-d

84.    Another complained online to the Better Business Bureau, writing:



## CLASS ACTION ALLEGATIONS

85.    Plaintiff brings this action on behalf of itself and on behalf of the

following proposed Nationwide Class, initially defined as follows:

> All businesses or entities, and/or any individuals with any
> ownership interest in such entities, in the United States
> who do not do business with Defendant ClassPass but who
> nevertheless have a landing page on a ClassPass website
> and/or within its mobile app, and/or such subclasses as the
> Court may deem appropriate.

86.    Plaintiff Leeah Nails also brings this action on behalf of itself and a

New Jersey Class, initially defined as follows:

> All businesses or entities, and/or any individuals with any
> ownership interest in such entities, in New Jersey who do
> not do business with Defendant ClassPass but who
> nevertheless have a landing page on a ClassPass website
> and/or within its mobile app, and/or such subclasses as the
> Court may deem appropriate.

87.    Excluded from the proposed Nationwide Class and the New Jersey Class

are Defendants, its parents, subsidiaries, affiliates, officers, and directors, any entity

in which Defendants have a controlling interest.

88.     Plaintiff reserves the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

89.     The claims of all class members derive directly from a single course of conduct by the Defendants.  Defendants have engaged and continue to engage in uniform and standardized conduct toward the class members.  Defendants do not differentiate, in degree of care or candor, in their actions or inactions, or the content of their statements or omissions, among individual class members.

90.     Certification of Plaintiff's claims is appropriate because Plaintiff can prove the elements of Plaintiff's claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

91.     Accordingly, Plaintiff brings this lawsuit as a class action on Plaintiff's own behalf and on behalf of all other business, entities, and individuals similarly situated pursuant under Fed. R. Civ. P. 23.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these provisions.

92.     Specifically, this action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

93.     **Numerosity** (Fed. R. Civ. P. 23(a)(1)).  The members of the proposed Classes are so numerous that their individual joinder would be impracticable.  While the exact number is not known at this time, it is generally ascertainable by

appropriate discovery, and it is believed the class includes many thousands of members.  The precise number of class members, and their addresses, are unknown to Plaintiff at this time, but can be ascertained from Defendants' records.

94.   **Ascertainability**.   The Classes are ascertainable because their members can be readily identified using business records, and other information kept by Defendants in the usual course of business and within their control or Plaintiff and the Classes themselves. Plaintiff anticipates providing appropriate notice to the Classes to be approved by the Court after class certification, or pursuant to court order.

95.   **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2); 23(b)(3)). Common questions of law and fact exist as to all class members. These questions predominate over the questions affecting only individual class members.   The common legal and factual questions include, without limitation:

(a) whether class members consented to the listing of their businesses and services on Defendants' website or mobile app;

(b) whether Defendants falsely promoted the purported size of the ClassPass Partner Network;

(c) whether Defendants targeted customers of class members and unfairly, unethically, unlawfully, falsely, fraudulently, deceptively, misleadingly, unconscionably, and/or confusingly redirected them to become ClassPass Subscribers;

(d) whether Defendants otherwise engaged in unfair, unlawful, fraudulent, unethical, unconscionable, and/or deceptive trade practices;

(e) whether Defendants had a duty to provide accurate information about class members' operations and that they are not affiliated with ClassPass;

(f) whether Defendants violated the applicable statutes identified herein;

(g) whether consumers are likely to be misled by Defendants' conduct;

(h) whether Defendants concealed material facts in their advertising materials and/or failed to adequately disclose material facts;

(i) whether Plaintiff and the Classes are entitled to actual, compensatory, nominal, statutory, and/or punitive damages;

(j) whether Plaintiff and the Classes are entitled to injunctive, declaratory relief, or other equitable relief;

(k) whether Plaintiff and the Classes are entitled to civil penalties; and

(l) whether Plaintiff and the Classes are entitled to reasonable attorneys' fees and costs.

96.   **Typicality of Claims** (Fed. R. Civ. P. 23(a)(3)).  The claims of the Plaintiff and the respective Classes are based on the same legal theories and arise from the same unlawful and willful conduct of Defendants, resulting in the same injury to the Plaintiff and the respective Classes.  Plaintiff and all class members are similarly affected by Defendants' wrongful conduct and were damaged in the same way.  Plaintiff's interests coincide with, and are not antagonistic to, those of the other

class members.  Plaintiff has been damaged by the same wrongdoing set forth in this Complaint.

97.   **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)).  Plaintiff is an adequate representative of the Classes because its interests do not conflict with the interests of the class members, and it has retained counsel competent and experienced in complex class action, business competition, and consumer litigation. Plaintiff and its counsel will fairly and adequately protect the interest of the class members.

98.   **Superiority of a Class Action** (Fed. R. Civ. P. 23(b)(3)).  A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and class members.  There is no special interest in class members individually controlling the prosecution of separate actions.  The damages suffered by individual class members, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  Further, it would be virtually impossible for the class members individually to redress effectively the wrongs done to them.  And, even if class members themselves could afford such individual litigation; the court system could not, given the thousands or even millions of cases that would need to be filed. Individualized litigation would also present a potential for inconsistent or contradictory judgments.  Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved.  By contrast, the class action device presents far fewer management

difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

99. **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief** (Fed. R. Civ. P. 23(b)(1) and (2)). In the alternative, this action may properly be maintained as a class action, because:

(a)     the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for Defendants; or

(b)     the prosecution of separate actions by individual class members would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

(c)     Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Classes as a whole.

100. **Issue Certification** (Fed. R. Civ. P. 23(c)(4)). In the alternative, common questions of fact and law are appropriate for issue certification on behalf of the proposed Classes.

<u>**FIRST CAUSE OF ACTION**</u>

**Unfair Competition and False Affiliation in Violation
of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)
(On Behalf of Plaintiff, the Nationwide Class, and the New Jersey Class)**

101.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

102.   Defendants' conduct as set forth herein significantly impacts interstate commerce and commerce within this district.

103.   Section 43 of the Lanham Act provides liability as to

> Any person . . . who uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities. . . .

104.   As described more fully herein, Defendants have engaged in a course of conduct with respect to the advertising of their ClassPass Partner Network that unfairly and falsely affiliates Plaintiff and class members with Defendants, diverting potential customers into purchasing ClassPass memberships.

105.    This conduct has caused, and is likely to cause, mistake and deception as to the affiliation, connection, or association of Plaintiff and the other class members.

106.    Through this conduct, ClassPass also misrepresents the nature and characteristics of its ClassPass Partner Network.

107.    This course of conduct includes, but is not limited to, the following:

(a)    confusing, or likely confusing, potential customers about the existence of any affiliation between Plaintiff and class members with ClassPass and the ability to book their services through ClassPass;

(b)    misrepresenting that Plaintiff and the class members have partnered with ClassPass and are part of its Partner Network;

(c)    misrepresenting that the services offered by Plaintiff and the class members may be booked through ClassPass;

(d)    misrepresenting the schedules of services offered by Plaintiff and class members;

(e)    misrepresenting the size and reach of the ClassPass Partner Network to entice individuals to purchase ClassPass memberships;

(f)    failing to inform ClassPass customers that Plaintiff and the class members do not belong to the ClassPass Partner Network;

(g)    failing to inform ClassPass customers that ClassPass credits cannot be used to pay for services rendered at Plaintiff and the class members' businesses;

(h)     misrepresenting the size and reach of the ClassPass Partner Network to convince businesses or entities to partner with ClassPass;

(i)     misrepresenting the size and reach of the ClassPass Partner Network to advertise corporate wellness programs to major corporations, which may purchase ClassPass memberships for their employees;

(j)     harming the reputations of Plaintiff and the class members by falsely affiliating them with ClassPass; and

(k)     stealing potential customers from Plaintiff and the class members by diverting them to purchase ClassPass memberships instead of transacting directly with Plaintiff and the class members.

108.    The false and misleading statements and omissions described herein are material because they are intended to have an impact on whether consumers become ClassPass Subscribers, on whether partners choose to join the ClassPass Partner Network, and whether corporations will adopt a ClassPass corporate-welfare program.

109.    The false and misleading statements and omissions described herein actually deceive or have the tendency to deceive customers of Plaintiff and class members.

110.    Defendants' conduct, as described herein, constitutes a violation of the Lanham Act § 43(a), 15 U.S.C. § 1125(a).

111.    As a direct and proximate result of Defendants' violation and false and misleading statements and omissions described herein, pursuant to 15 U.S.C. § 1117,

Plaintiff and the class members have been, or are likely to be, damaged.  Plaintiff and the Classes are likewise entitled to recover from Defendants all profits, gains and advantages obtained stemming from this improper conduct.

112.    Pursuant to 15 U.S.C. § 1117, Plaintiff is further entitled to recover the costs of this action.  Defendants' conduct was intentional, characterized by an evil motive, and with the design of deceiving the general public to unfairly reap profits at the expense of Plaintiff and the Classes, entitling Plaintiff to a statutory multiplier of actual damages, additional damages and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION

**False Advertising in Violation of Section 43 of the Lanham Act,
15 U.S.C. § 1125(a)
(On Behalf of Plaintiff, the Nationwide Class, and the New Jersey Class)**

113.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

114.    Defendants' conduct as set forth herein significantly impacts interstate commerce and commerce within this district.

115.    As described more fully herein, Defendants have engaged in a course of conduct with respect to the advertising of its ClassPass Partner Network that contains false and/or misleading statements of fact, or omissions of critical facts, including those about Plaintiff and class members, which did not actually partner with ClassPass.

116.    These false and/or misleading statements, or omissions of material facts, include, but are not limited to, the following:

(a)     confusing, or likely confusing, potential customers of Plaintiff and the class members as to Plaintiff and the class members' affiliation with ClassPass and the ability to use ClassPass to book their services;

(b)     misrepresenting that Plaintiff and the class members have partnered with ClassPass and are part of ClassPass's Partner Network;

(c)     misrepresenting that the services offered by Plaintiff and the class members may be booked through ClassPass;

(d)     misrepresenting the schedules of services and availability of appointments offered by Plaintiff and the class members;

(e)     misrepresenting the size and reach of the ClassPass Partner Network to entice individuals to purchase ClassPass memberships;

(f)     failing to inform ClassPass customers that Plaintiff and the class members are in no way affiliated with the ClassPass Partner Network;

(g)     failing to inform ClassPass customers that ClassPass credits cannot be used to pay for services rendered at Plaintiff and the class members' businesses;

(h)     misrepresenting the size and reach of the ClassPass Partner Network to convince businesses or entities to partner with ClassPass;

(i)     misrepresenting the size and reach of the ClassPass Partner Network to advertise corporate-wellness programs to major corporations, which may purchase ClassPass memberships for their own employees;

(j)      harming the reputations of Plaintiff and the class members by falsely affiliating them with ClassPass; and

(k)      stealing potential customers from Plaintiff and the class members by diverting them to purchase ClassPass memberships instead.

117.   The false and misleading statements and omissions described herein are material, are intended to have an impact on whether consumers subscribe to ClassPass memberships, on whether partners choose to join the ClassPass Partner Network, and whether corporations will adopt a ClassPass corporate-wellness program.

118.   The false and misleading statements and omissions described herein actually deceive or have the tendency to deceive customers of Plaintiff and the class members.

119.   Defendants' conduct as described herein constitutes a violation of the Lanham Act § 43(a), 15 U.S.C. § 1125(a).

120.   As a direct and proximate result of Defendants' violation and false and misleading statements and omissions described herein, pursuant to 15 U.S.C. § 1117, Plaintiff and the Classes have or are likely to be damaged.  Plaintiff and the Classes are likewise entitled to recover from Defendants all profits, gains and advantages obtained stemming from this improper conduct.

121.   Pursuant to 15 U.S.C. § 1117, Plaintiff is further entitled to recover the costs of this action. Defendants' conduct was intentional, characterized by an evil motive, and with the design of deceiving the general public to unfairly reap profits at

the expense of Plaintiff and the Classes, entitling Plaintiff to a statutory multiplier

of actual damages, additional damages and reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION

**Violations of the New York Deceptive and
Unfair Trade Practices Act, N.Y. Gen. Bus. Law § 349
(On Behalf of Plaintiff, the Nationwide Class, and the New Jersey Class)**

122.    Plaintiff incorporates by reference all allegations in this Complaint and

restates them as if fully set forth herein.

123.    Defendant ClassPass was founded and is headquartered in New York,

New York.

124.    ClassPass's terms of service—which Plaintiff and the class members

never agreed to—is governed by New York law and mandates that any suit be brought

in this State.

125.    Being located in New York and New York City were and are

instrumental in ClassPass's past and continued growth. As Defendant Kadakia

explained in a December 12, 2019 interview with CSQ Magazine:

> ***Due to New York's emergence as a tech and
> innovation hub*** in recent years, Kadakia says, a huge
> influx of new studios are opening all over the Big Apple.
> And, she points out, studio owners are entrepreneurs, too.
> ***The New York market was also vital for gathering
> feedback during the early days***, and L.A., a hub for
> health and wellness, was ready to embrace ClassPass as a
> regular part of the culture.

126.    Defendant Kadakia has also credited ClassPass's early success to

getting into TechStar's New York City incubator in 2012.

127.   NY GBL § 349 applies to Plaintiff and other non-New York resident class members because the State of New York has an interest in regulating Defendants' conduct within and emanating from New York and because Defendants' conduct in New York has a broad impact on consumers at large.

128.   Any person who has been injured by reason of any violation of NY GBL § 349 may bring an action in his or her own name to enjoin such unlawful acts or practices, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions.  The court may, in its discretion, increase the award of damages to an amount not exceeding three times the actual damages, in addition to one thousand dollars per violation, if the court finds that the Defendants willfully or knowingly violated this section.  The court may award reasonable attorneys' fees to a prevailing plaintiff.

129.   The practices employed by Defendants, by which they advertise, promote, and market the ClassPass Partner Network were directed to customers and violate GBL § 349.

130.   Plaintiff and the class members have been injured by Defendants' deceptive acts or practices.

131.   Plaintiff and the class members have no adequate remedy at law.

132.   Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiff and the Classes, and will continue to both damage Plaintiff and the Classes and deceive the public unless enjoined by this Court.

## FOURTH CAUSE OF ACTION

**False Advertising in Violation of N.Y. Gen. Bus. Law § 350**
**(On Behalf of Plaintiff, the Nationwide Class, and the New Jersey Class)**

133.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

134.    Defendant ClassPass was founded and is headquartered in New York, New York.

135.    ClassPass's terms of service—which Plaintiff and the class members never agreed to—are governed by New York law and mandates that any suit be brought in this State.

136.    Being located in New York and New York City were and are instrumental in ClassPass's past and continued growth. As Defendant Kadakia explained in a December 12, 2019 interview with CSQ Magazine:

> ***Due to New York's emergence as a tech and innovation hub*** in recent years, Kadakia says, a huge influx of new studios are opening all over the Big Apple. And, she points out, studio owners are entrepreneurs, too. ***The New York market was also vital for gathering feedback during the early days***, and L.A., a hub for health and wellness, was ready to embrace ClassPass as a regular part of the culture.

137.    Defendant Kadakia has also credited ClassPass's early success to getting into TechStar's New York City incubator in 2012.

138.    NY GBL § 350 applies to Plaintiff and other non-New York resident class members because New York has an interest in regulating Defendants' conduct within and emanating from New York and because this New York conduct has a broad impact on consumers at large.

139.   By reason of the acts set forth above, Defendants have been and are engaged in consumer-oriented advertising and marketing in the conduct of their business, trade and/or commerce that is false and misleading in material respects, in violation of Section 350 of the New York General Business Law.

140.   Defendants caused to be disseminated throughout New York State and elsewhere, through advertising, marketing, and other publications, statements that were untrue or misleading, and which they knew to be untrue or misleading.

141.   Defendants' misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large.  Consumers were and continue to be exposed to Defendants' material misrepresentations.

142.   Plaintiff and the class members have been injured by Defendants' deceptive acts or practices.

143.   Plaintiff and the class members have no adequate remedy at law.

144.   Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiff and the Classes and will continue to both damage Plaintiff and the Classes and deceive the public unless enjoined by this Court.

145.   Pursuant to NY GBL § 350-e, Plaintiff and the Classes seek monetary damages (including actual damages or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to NY GBL § 350-a(1)), injunctive relief, restitution, and disgorgement of all monies obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## FIFTH CAUSE OF ACTION

### Common Law Unfair Competition
### (On Behalf of Plaintiff, the Nationwide Class, and the New Jersey Class)

146.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

147.   As described herein, Defendants have engaged in a course of conduct with respect to the advertising of its ClassPass Partner Network that unfairly and falsely affiliates Plaintiff and class members with Defendants, diverting potential customers into purchasing ClassPass memberships instead of directly purchasing services from Plaintiff and the class members.

148.   By misappropriating and trading upon the goodwill and business reputation of Plaintiff and the class members, Defendants have acted in bad faith and have been unjustly enriched, and will continue to do so, unless enjoined by this Court.

149.   Defendants' wrongful conduct constitutes unfair competition under common law.  Plaintiff and the Classes have no adequate remedy at law.

150.   Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiff and the Classes and will continue to damage them and deceive the public unless enjoined by this Court.

## SIXTH CAUSE OF ACTION

### Violation of the New Jersey Unfair Competition Act, N.J.S.A. § 56:4-1
### (On Behalf of Plaintiff and the New Jersey Class)

151.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

152.   Defendants' appropriation of the business names, lists of services, and goodwill of the Plaintiff and the class members in connection with Defendants' sales and marketing of ClassPass memberships and corporate-wellness programs, violates the New Jersey Unfair Competition Act, N.J.S.A. § 56:4-1.

153.   Plaintiff and the class members have been injured by Defendants' deceptive acts or practices.

154.   Plaintiff and the class members have no adequate remedy at law.

155.   Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiff and the Classes and will continue to both damage Plaintiff and the Classes and deceive the public, unless enjoined by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the proposed Classes, prays for relief and judgment against Defendants as follows:

A.   certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as a representative of the Class, and designating Plaintiff's counsel as Class Counsel;

B.   awarding Plaintiff and the Classes compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

C.   awarding Plaintiff and the Classes appropriate relief, including actual and statutory damages;

D.   for punitive damages;

E.   for civil penalties;

F.      for declaratory and equitable relief, including restitution and disgorgement;

G.      for an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

H.      awarding Plaintiff and the Classes the costs of prosecuting this action, including expert witness fees;

I.      awarding Plaintiff and the Classes reasonable attorneys' fees and costs as allowable by law;

J.      awarding pre-judgment and post-judgment interest; and

K.      granting any other relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demand a trial by jury on all issues so triable.

Dated: October 22, 2021

By: /s/ *Raphael Janove*
Raphael Janove
Adam Pollock
Agatha M. Cole
**POLLOCK COHEN LLP**
60 Broad St., 24th Fl.
New York, New York 10004
 (212) 337-5361
Rafi@PollockCohen.com
Adam@PollockCohen.com
Agatha@PollockCohen.com

*Attorneys for Plaintiff and the Proposed Classes*