**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TIPSY NAIL CLUB LLC, SALON PHOENIX COSMETOLOGY, LLC, RAPHA MASSAGE, LLC, ENLIGHTEN MASSAGE THERAPY LLC, THE FACIAL BAR, LLC, SALON GOLDYN, INC, and SALON HAIRROIN, INC., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CLASSPASS INC., CLASSPASS, LLC, FRITZ LANMAN, and PAYAL KADAKIA,<br><br>Defendants. | <u>**CLASS ACTION**</u><br><br><u>**DEMAND FOR JURY TRIAL**</u><br><br>No. 21 Civ. 8662 (AT) (SN) |

**FIRST AMENDED**
**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................. 1

JURISDICTION AND VENUE .......................................................................... 5

THE PARTIES .................................................................................................... 6

    I.    Plaintiffs ................................................................................................... 6

    II.   Defendants................................................................................................ 7

    III.  ClassPass's Financial Backers................................................................ 9

FACTUAL ALLEGATIONS .............................................................................. 9

    I.    Background on ClassPass and Its Business Model ................................. 9

          A.   ClassPass Promotes Itself as a Marketplace Connecting
               Customers to Gyms, Spas, and Salons ......................................... 9

          B.   ClassPass Expands into "Beauty and Wellness" Services ......... 11

          C.   ClassPass's Current Business Model Relies on Its Purportedly
               Expansive Partner Network ......................................................... 13

    II.   ClassPass Lists Thousands of Businesses Without Their Agreement,
        Harming Them and Their Customers.................................................... 18

          A.   ClassPass Has Been Misappropriating Business Names and
               Services From Its Inception ......................................................... 18

          B.   ClassPass Misappropriates Businesses' Names, Descriptions,
               and Services to Falsely Exaggerate the Size and Reach of the
               ClassPass Partner Network ......................................................... 22

          C.   ClassPass Lists Plaintiffs Without Their Permission ................ 34

               i)     Leeah Nails .......................................................... 34

               ii)    Salon Phoenix....................................................... 38

               iii)   Rapha Massage ..................................................... 40

               iv)   Midvalley Massage .............................................. 41

               v)    The Facial Bar....................................................... 42

               vi)   Salon Goldyn ........................................................ 43

               vii)  Hairroin Salon....................................................... 45

D.     ClassPass Targets Businesses to Promote the Benefits of
       Partnerships Without Informing Them They Are Listed .......... 48

E.     ClassPass's Conduct Has and Will Continue to Harm Plaintiffs
       and Other Businesses .................................................... 49

       i)     ClassPass's False Affiliation of These Businesses Injures
              Their Reputations ................................................ 49

       ii)    Customers "Booking" Reservations Through ClassPass
              Also Harms Businesses ....................................... 52

F.     ClassPass's Conduct Misleads, Confuses, and Harms Countless
       Individuals, Substantially Injuring the Public Interest ............ 57

CLASS ACTION ALLEGATIONS ................................................ 60

FIRST CAUSE OF ACTION ...................................................... 67

SECOND CAUSE OF ACTION ................................................... 70

THIRD CAUSE OF ACTION ...................................................... 73

FOURTH CAUSE OF ACTION ................................................... 75

FIFTH CAUSE OF ACTION ...................................................... 78

SIXTH CAUSE OF ACTION ...................................................... 78

SEVENTH CAUSE OF ACTION ................................................. 79

EIGHTH CAUSE OF ACTION ................................................... 80

NINTH CAUSE OF ACTION ..................................................... 81

TENTH CAUSE OF ACTION ..................................................... 82

PRAYER FOR RELIEF ............................................................ 83

Plaintiffs Tipsy Nail Club LLC ("Leeah Nails"), Salon Phoenix Cosmetology, LLC ("Salon Phoenix"), Rapha Massage, LLC ("Rapha Massage"), Enlighten Massage Therapy LLC ("Midvalley Massage"), The Facial Bar, LLC ("The Facial Bar"), Salon Goldyn, Inc ("Salon Goldyn"), and Salon Hairroin, Inc. ("Hairroin Salon") (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action suit for damages and equitable relief against Defendants ClassPass Inc., its CEO Fritz Lanman, its Founder and Executive Chairman Payal Kadakia, and ClassPass, LLC (collectively "ClassPass" or "Defendants"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves, on their own investigation, and on the investigation of their counsel, and on information and belief as to all other allegations:

## NATURE OF THE ACTION

1.     ClassPass dubs itself "The app for all things fitness, spa & beauty." It operates an online platform that allows its customers, who purchase the Company's membership subscriptions (the "ClassPass Subscribers" or "Subscribers"), to book classes at gyms and fitness studios, and more recently, "wellness appointments" and "beauty" services such as manicures, pedicures, massages, and haircuts at salons and massage spas.

2.     Emphasizing its vast "network" of "partner" businesses (the "ClassPass Partner Network"), ClassPass promotes the size of its ClassPass Partner Network to (a) persuade existing Subscribers to purchase additional credits, which are meant to be used to book classes and appointments, (b) attract more customers to purchase ClassPass memberships, (c) convince other businesses to choose to partner with it,

and (d) sell corporate-wellness programs to major companies that wish to offer memberships as an employee benefit.

3.      In reality, however, ClassPass's so-called "network" is built on *thousands* of false listings of health clubs, beauty salons, and massage parlors comprising the putative classes (the "Classes," defined below) of businesses that never partnered with it and/or do not even wish to be affiliated with ClassPass.

4.      Indeed, ClassPass has falsely advertised the size of its network by creating thousands of ClassPass pages for businesses without their permission. These fake listings include (a) the business's name, a description of the business, contact information, and service offerings copied from the actual business's website, (b) the same generic language describing the business ("[type of business] are busy and wait times can be unpredictable"), (c) stock photos, and (d) schedules fabricated by ClassPass (i.e., not the business's actual schedules) of purported available time slots for ClassPass Subscribers to book.

5.      Listing businesses on ClassPass that are *not* partners hurts those businesses. As detailed herein, the businesses lose control of their brands. And, because ClassPass copied the businesses' information from their websites at some point in the past, the types of services offered may have changed and the businesses may have moved locations or changed their hours. Accordingly, ClassPass sends its Subscribers to businesses that may be closed, moved, or have no availability. Thus, businesses, through no fault of their own, have faced upset customers who blame

them for the confusion and not ClassPass, and have received negative reviews and ratings in important online forums.

6.     ClassPass pays little or no regard to whether gyms, salons, and other entities desire to do business with it at all. Indeed, ClassPass knows that businesses do not want their information on ClassPass's website or app, as numerous companies have demanded ClassPass remove their information. Nevertheless, ClassPass continues to list thousands of class members on its platform.

7.     Succinctly, ClassPass is listing businesses and allowing its members to click on specific times to "reserve" appointments, *and* taking money from those customers, all without ever entering into an agreement with these businesses.

8.     As of November 1, 2021, out of the claimed 20,000 partners in ClassPass's "beauty and wellness" category alone, nearly 7,500 of ClassPass's business listings fit the pattern above.  Thus, on information and belief, well over a third of the businesses ClassPass identifies as "partners" have not agreed to affiliate with ClassPass in any way.

9.     On average, nearly 50% of the "beauty and wellness" listings near major metropolitan areas fit the fake-partner listings pattern. For instance:

- New York, New York: over 53% of 3,617 listings fit the pattern;

- Phoenix, Arizona: over 67% of 1,608 listings;

- Salt Lake City, Utah: over 58% of 311 listings;

- Orlando, Florida: over 77% of 782 listings; and

- Denver, Colorado: over 52% of 575 listings.

10.    Percentages are even higher in areas near smaller cities. For example, 91%, or 80 of 88 listings in the Bridgeport, Connecticut region fit the pattern.

11.    ClassPass's conduct of listing businesses without their permission is not new; nor is it limited to the beauty and wellness industries. As Defendant Kadakia has admitted, since its inception, ClassPass has listed gyms and fitness studios and their class schedules without obtaining their permission.

12.    Plaintiffs are small businesses throughout the country that never agreed to partner with ClassPass. Nevertheless, ClassPass has, without permission, listed Plaintiffs' and the class members' business and service offerings on its website and app in a manner that intentionally misrepresents that the businesses are part of the ClassPass Partner Network.

13.    Defendants have engaged in a uniform course of conduct as to the advertising of its ClassPass Partner Network that unfairly and falsely affiliates Plaintiffs and class members with ClassPass.

14.    These fake partner listings are central to ClassPass's business model and have contributed to ClassPass's apparent success.

15.    Plaintiffs bring this class action on behalf of themselves and the Classes for false affiliation, reverse passing off, false advertising, and unfair competition under federal and state law. In addition to monetary relief, Plaintiffs seek to prevent Defendants from continuing to misappropriate and trade upon the goodwill and business reputation of Plaintiffs and class members by listing their businesses on ClassPass's website and mobile application ("app") without their permission.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; the number of members of the proposed Classes exceeds 100; and many members of the proposed Classes are citizens of different states than the Defendants.

17.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1332(d)(2).

18.     This Court has personal jurisdiction over Defendants ClassPass Inc. and ClassPass, LLC because Defendants are headquartered in the State of New York, regularly conduct business in this Judicial District, and have extensive contacts with this forum.

19.     This Court has personal jurisdiction over Defendants Fritz Lanman and Payal Kadakia because they regularly conduct business in this Judicial District and have extensive contacts with this forum.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants transact substantial business in this District.

21.     This Court has supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367.

## THE PARTIES

### I.   Plaintiffs

22.   Plaintiff Tipsy Nail Club LLC ("Leeah Nails") is a New Jersey limited liability corporation. It operates under the name "Leeah Nails" and is located in Montclair, New Jersey.

23.   Plaintiff Salon Phoenix Cosmetology, LLC ("Salon Phoenix") is a New Jersey limited liability corporation located in Hoboken, New Jersey.

24.   Plaintiff Rapha Massage, LLC ("Rapha Massage") is a Connecticut limited liability corporation located in Bridgeport, Connecticut.

25.   Plaintiff Enlighten Massage Therapy LLC ("Midvalley Massage") is a Utah limited liability corporation. It does business as "Midvalley Massage and Hypnotherapy" and is located in Millcreek, Utah.

26.   Plaintiff The Facial Bar, LLC ("The Facial Bar") is a Missouri limited liability corporation and is located in Kansas City, Missouri.

27.   Plaintiff Salon Goldyn, Inc ("Salon Goldyn") is a Colorado corporation and is located in Denver, Colorado.

28.   Plaintiff Salon Hairroin, Inc. ("Hairroin Salon") is a California corporation, which does business as "Hairroin Salon" and is located in Los Angeles, California.

29.   All Plaintiffs were listed on Defendants' websites and app without their permission.

## II.   **Defendants**

30.   Defendant ClassPass Inc. is incorporated in Delaware and maintains its principal place of business at 275 7th Ave, New York, New York.

31.   Defendant ClassPass, LLC is incorporated in Delaware and maintains its principal place of business at 275 7th Ave, New York, New York.

32.   ClassPass, LLC was created in connection with an acquisition of ClassPass by Mindbody Inc. ("Mindbody"), a California-based software as-a-service company that provides software tools to gyms, fitness studios, salons, and spas.

33.   In the spring of 2021, Mindbody was in talks to acquire ClassPass and on October 13, 2021, Mindbody announced it would acquire ClassPass.

34.   Pursuant to a Plan of Merger, dated as of August 27, 2021, upon the effectiveness of the merger of ClassPass Inc., the surviving ClassPass entity shall be ClassPass, LLC.

35.   According to LinkedIn, ClassPass has over 500 employees, with some 20% of those located in New York. ClassPass is registered to do business in New York and does business throughout the United States and some thirty countries worldwide. It claims (falsely) that it has over 50,000 partner businesses in its ClassPass Partner Network.

36.   Defendant Payal Kadakia is the Founder and Executive Chairman of ClassPass. She served as CEO until 2017 and transacts substantial business in New York. At all relevant times, Defendant Kadakia was the motivating, active, and conscious force behind the unlawful actions of ClassPass, as alleged herein, and as an officer of ClassPass, controlled, authorized, directed, and approved this

- 7 -

misconduct. For instance, after transitioning from CEO to Executive Chairman, Kadakia stated that she is still "very much involved in running" ClassPass and focuses on "strategy and vision of the Company."

37.     In addition, in an interview that Kadakia announced on Twitter on November 10, 2021, she credited ClassPass's success to her efforts, claiming: "I mean a lot of it was me." She further credited "a big part of [the Company's growth]" to her "origin story," explaining that "it's story telling . . . ***customers want something authentic***." Kadakia has also personally and individually falsely promoted the size of the ClassPass Partner Network.

38.     Defendant Fritz Lanman is the CEO of ClassPass. He was an early investor in ClassPass and began working at ClassPass in 2013. He formerly served as ClassPass's Executive Chairman until becoming the CEO in 2017. Payal Kadakia, in explaining the transition to Lanman as CEO, stated: "Fritz and I have had such a great relationship and I trust him 100 percent. ***He knows exactly what I want to build***." She further explained that Lanman has been involved in running the "day to day" of ClassPass since 2014.

39.     Lanman transacts substantial business in New York. At all relevant times, Lanman was the motivating, active, and conscious force behind the unlawful actions of ClassPass, as alleged herein, and as an officer of the Company, controlled, authorized, directed, and approved this misconduct. Lanman has also personally and individually falsely promoted the size of the ClassPass Partner Network.

### III. ClassPass's Financial Backers

40.     As mentioned above, since its inception, ClassPass has worked with Mindbody, and Mindbody has now acquired ClassPass.

41.     The investment firm Vista Equity Partners acquired Mindbody in 2018 in a $1.9 billion all-cash deal.

42.     Investment firm Sixth Street invested $500 million in Mindbody in connection with the acquisition of ClassPass.

43.     In addition, certain venture capital funds have repeatedly invested in ClassPass's operations, and the investors intend to remain with ClassPass post-Mindbody's acquisition. Lead investors include Defendant Lanman, Apax Digital, Emergent Ventures, Temasek Holdings, Hank Vigil, Acequia Capital, L Catterton, Thrive Capital, General Catalyst, and GV.

## FACTUAL ALLEGATIONS

### I. Background on ClassPass and Its Business Model

#### A. ClassPass Promotes Itself as a Marketplace Connecting Customers to Gyms, Spas, and Salons

44.     Founded in 2012 and previously known as "Dabble" or "Classtivity," ClassPass started in two countries and originally focused on connecting fitness studio owners to consumers who wanted to book fitness classes. ClassPass now operates in thirty countries and has expanded its business model to the wellness and beauty industries.

45.   ClassPass grew quickly in its early years, with revenues jumping from $200,000 in 2014 to over $100 million in 2016. By March 2019, ClassPass Subscribers had booked more than 65 million classes or services using ClassPass.

46.   Having raised hundreds of millions of dollars in funding in less than a decade, ClassPass reached a valuation of over $1 billion in early 2020.

47.   ClassPass bills itself as a digital middleman that operates in a two-sided market, serving as an intermediary between its ClassPass Subscribers and businesses (such as gyms or salons) that partner with ClassPass or, in the case of Plaintiffs and the Classes, otherwise appear on ClassPass's website or app.

48.   ClassPass Subscribers pay for a monthly subscription, which varies by location but generally ranges from $15 to over $200 a month. The ClassPass Subscribers, in turn, receive credits, which they use to book services with ClassPass partners.

49.   ClassPass encourages its Subscribers to purchase additional credits to book more classes and services. However, ClassPass restricts the ability of Subscribers to roll-over unused credits at the end of the month. As a result, Subscribers may lose their unused credits, a problem that is exacerbated when a business cancels a service before the Subscriber has time to use such credits elsewhere.

50.   When ClassPass Subscribers book a class or service with a bona fide ClassPass partner, ClassPass will pay that partner a negotiated rate.

### B.   ClassPass Expands into "Beauty and Wellness" Services

51.   On February 20, 2018, ClassPass issued a press release announcing that it was "expanding beyond fitness to incorporate wellness offerings." Defendant Fritz Lanman, the CEO of ClassPass, stated that "Expanding into wellness has been on our radar for some time," and Defendant Payal Kadakia, ClassPass's founder, added, "It has ***always been our goal*** to expand beyond fitness classes."

52.   This expansion became more important to ClassPass's business when the COVID-19 pandemic ground ClassPass to a near halt, and people stopped going to gyms. As a result, in May 2020, ClassPass laid off or furloughed 53% of its staff and lost 95% of its weekly revenue.

53.   Nonetheless, ClassPass quickly pivoted. As relayed in a June 23, 2020 interview with Fritz Lanman, within 10 days of the COVID-19 lockdowns, ClassPass implemented a live streaming option for fitness classes. Lanman asserted that ClassPass "ha[s] a lot of wind in [its] sails" because of market trends in favor of "health and wellness or finding group fitness."

54.   In a September 15, 2020 interview, Lanman doubled down on his optimism for ClassPass, and again emphasized that ClassPass had been "bulk[ing] up salon and spa services" to weather the pandemic, explaining: "By adding wellness and beauty and additional digital experiences like one-to-one personal training, we've expanded our product portfolio and the different ways that you can get value from ClassPass. That protects us from COVID in a prolonged situation."

55.   In a September 9, 2021 Quartz magazine article, Defendant Lanman explained that ClassPass was hedging its bets by expanding into wellness and beauty

and setting up corporate-wellness programs for large companies. Lanman also claimed that half of Americans are located near at least five ClassPass-affiliated studios. Furthermore, Lanman reported that since June 2021, 90% of ClassPass Subscribers are back to active—i.e., paying—subscriptions.

56.     And in an interview with Forbes on October 13, 2021, Defendant Kadakia boasted about ClassPass's expansion into the wellness industry as a sign of its resilience after COVID-19, explaining: "We started launching new products like wellness on there . . . and the company is bigger and stronger because of it."

57.     In promoting the Forbes interview on LinkedIn, Defendant Kadakia highlighted Defendant Lanman's efforts in ClassPass's success, writing: "Big thank you to the incredible ClassPass Team, especially Fritz Lanman."

58.     ClassPass's success has only continued. Reports surfaced in May 2021 that it was in merger talks with Mindbody. (Since inception, ClassPass has used Mindbody's third-party booking platform.)

59.     Then, on October 13, 2021, ClassPass announced that Mindbody was acquiring ClassPass. Mindbody also announced that global asset manager Sixth Street would invest $500 million in the post-merger company.

60.     In praising the deal, Mindbody CEO Josh McCarter emphasized the value of ClassPass's supposed "huge network of wellness businesses."

61.     That same day, Lanman further boasted about ClassPass's expansion into other business lines: "Over the past year, ClassPass has considered many paths

forward including independent options that valued our business at a significant uptick since our previously confirmed January 2020 valuation of over $1 billion."

62.     Also, on a November 5, 2021 interview between McCarter and Lanman about their respective companies' merger, Lanman predicted that the merger "will make it easier for those spas and salons ***who do want*** to work with us work with us," adding that "most of our energy in the last 18 months has actually gone to adding folks . . . who more represent those types of services."

63.     During the interview, Lanman also acknowledged that businesses may not want to partner with ClassPass: "***Is a business owner ever going to prefer that a customer comes through an aggregator? No.*** But it's at least a much friendlier way, and it allows for some price discrimination."

64.     Currently, ClassPass claims that it has some 20,000 beauty and wellness partners.

## C.     ClassPass's Current Business Model Relies on Its Purportedly Expansive Partner Network

65.     With the rise of the internet, digital middlemen are increasing in importance, as they potentially create databases and platforms accessible to new and wider audiences.

66.     Within a two-sided market, a business's goal is to connect consumers and producers to each other, while reaping profits from both. Digital middlemen, like ClassPass, DoorDash and GrubHub, often corner a market by offering below-market prices, while providing an attractive quantity of potential users to sellers. These

digital middlemen generate revenue by taking a commission from each sale or subscription.

67.    Because ClassPass is the intermediary between its Subscribers and its business affiliates (the companies offering the services), the number of participants on one side determines the platform's appeal to the other.

68.    As Kadakia stated in a June 2020 interview, "we are a two-sided marketplace, we are always trying to balance the two and be this middleman trying to make both sides happy."

69.    Economists Thomas Eisenmann, Geoffrey Parker, and Marshall W. Van Alstyne also explain in the Harvard Business Review:

> The two groups are attracted to each other — a phenomenon that economists call the network effect. With two-sided network effects, the platform's value to any given user largely depends on the number of users on the network's other side. Value grows as the platform matches demand from both sides.

70.    The inverse is also true. As economist Hal Varian writes:  "This positive feedback loop also works in reverse: if adoption fails to reach a critical mass of users, the good or service may fall into a 'death spiral' and ultimately disappear."

71.    Two-sided network effects are often localized. Put simply, no number of vendors in New York will increase the appeal of the platform to a customer looking for service only in Missouri. This limitation means that platforms like ClassPass must independently reach a critical mass of users on each side of the platform in every area they seek to operate.

72.     Network effects and the economics of operating in a two-sided market are directly reflected in ClassPass's advertising and marketing. In essence, the purported size of the Partner Network forms the basis of ClassPass's marketing claims to consumers.

73.     Prominently, ClassPass touts the wide reach of the ClassPass Partner Network. For instance, it claims that its members can "[a]ccess thousands of gyms, fitness studios, and wellness centers with one easy-to-use app." In fact, this claim of offering "thousands" of gyms, studios, and centers is plastered across its website; in ClassPass's "Common Questions" section, the question, "Where can I use my ClassPass credits?" is answered with, "Short answer, thousands of places."

74.     ClassPass has also offered free trial memberships, advertising: "Try ClassPass for access to thousands of gyms, fitness studios, salons and spas, all for free."

75.     ClassPass further boasts that Subscribers can "[u]se your membership in 2,500 cities worldwide" and that they get "special rates," such as an average savings of "30% off the average price of a fitness class."

76.     ClassPass, in turn, entices gyms, spas, beauty and wellness salons, and massage parlors and spas by promising that a partnership will connect them to ClassPass Subscribers. ClassPass represents that it takes businesses less than 10 minutes to sign up and upload their classes and services, and that by doing so, these businesses can "[t]ap into new audiences and reach thousands of ClassPass customers in your area."

77.     MindBody's and ClassPass's shared website similarly touts the number of customers businesses may reach:

> By joining ClassPass ***as a partner***, you gain access to the hundreds of thousands of ClassPass members that use the app to discover and reserve at businesses in their communities. In 2020, 95% of ClassPass subscribers reported that they plan on frequenting beauty and wellness businesses at least once every 2-3 months when their cities reopen, with 46% planning on booking multiple times each month upon reopening.

78.     In addition, ClassPass tries to convince businesses to join the ClassPass Partner Network because, supposedly, a lot of other businesses have already chosen to partner with them. For instance, ClassPass's website boasts: "Studios of all sizes partner with ClassPass. Whether you're an established studio or just starting out, you'll be in good company."

79.     Historically, ClassPass has offered additional perks and incentives, such as a $20,000 sign-on bonus, to get studios to join the ClassPass Partner Network.

80.     Kadakia has explained the significant time investment it required to convince studios to join ClassPass. She related how in its early days, ClassPass "did so much to understand [the] business[es]" and that she and her employees would attend classes themselves. After classes, they talked to businesses while "in our sweaty clothes." ClassPass found that this was more effective than going to studios "with suits" talking about "some marketing platform."

81. Kadakia further explained in an interview in early November 2021 that going to studios helped sign up new businesses because, after class, they would have an "informal type of meeting but it *made them feel like we cared*."

82. Mindbody hosts ClassPass on its partner-store website and also leverages the purported size of the ClassPass Partner Network to entice other businesses to sign-up:

> ClassPass is the world's leading fitness and wellness network. By listing your livestream and in-person classes and appointments on ClassPass, you can reach new users — wherever they may be — and maximize your revenue. ***Join over 50,000 health and wellness partners around the world growing their businesses on ClassPass***.

83. ClassPass also boasts about the reach of its Partner Network to promote its corporate-wellness program, which it advertises to companies that seek to provide memberships as an employee benefit:



Give your employees the best in fitness & wellness

ClassPass corporate plans provide employees with the ultimate flexibility. Employees get access to over 41,500 fitness studios, gyms and wellness options worldwide. Plans are month-to-month with no annual commitments. And employees save by only paying for employees who sign up.

84. ClassPass's corporate-wellness partners include major corporations such as United Airlines, T-Mobile, Walgreens, Southwest Airlines, AT&T, American Airlines, Aetna, Refinery29, and PetCo. ClassPass claims that corporate "[e]mployees

get access to over 41,500 fitness studios, gyms and wellness options worldwide." Defendant Lanman exclaimed that in just six months in 2019, ClassPass's corporate-wellness business had "quintupled."

## II.   ClassPass Lists Thousands of Businesses Without Their Agreement, Harming Them and Their Customers

### A.   ClassPass Has Been Misappropriating Business Names and Services From Its Inception

85.   Since its inception, ClassPass has been listing businesses, including gyms and fitness studios, without permission.

86.   On June 29, 2020, Defendant Payal Kadakia was interviewed on the NPR podcast, *How I Built This*, and explained that ClassPass has a history of listing gyms and fitness studios without their permission.

87.   In its early days, Kadakia explained, ClassPass developed an application programming interface ("API") to collect various gyms and studios' class schedules. ClassPass was "sort of scaping data . . . to master . . . like sort of becoming this Google, right, of class information."

88.   ClassPass had made "a volume bet essentially"—that by listing lots of information on its website, it would garner customers and studio partners.

89.   While ClassPass "had a variety of different studios on the platform," Kadakia admitted that "there were certain studios that we just put on the platform where we didn't have like full agreements with yet."

90.   Kadakia further explained that when someone reserved a class through ClassPass but the studio did not actually partner with it, ClassPass would simply

manually create that reservation with the studio "on the back end" and pay for the class. Despite the costs of paying the classes for full price, "in the beginning, **we didn't really care,** we were just testing the concept. We just wanted to prove that we could do this and get their attention."

91.     After one funding round, where ClassPass netted $2 million, the Company "needed to make sure that this was just not a New York phenomenon." So it expanded quickly. As Kadakia related, "We were able to get cities up in a matter of two weeks."

92.     In 2015, ClassPass also had an "operation" to be "in 20 cities by end of the year," and ended up in twelve new cities in a matter of three months.

93.     In describing this strategy for rapid expansion, Kadakia admitted that at least some companies that signed up with ClassPass later regretted it. They had no choice: "There's companies who have **had to deal with discounts who didn't want to**."

94.     Throughout its history, ClassPass has used false claims of "partnerships" to promote its business, with the mindset, as Kadakia explained of, "do[ing] what you need to [do]."

95.     For instance, ClassPass ran a promotion, offering gift cards from the fitness-clothing company Lululemon. Kadakia "remember[s] celebrating" when Lululemon sent ClassPass a cease-and-desist letter because "Lululemon knows who we are." ClassPass had been marketing the gift card as a "joint promotion" or "partnership." Despite Lululemon's letter, ClassPass continued to market the

promotion "once or twice more," with Kadakia explaining that, "at the end of the day, *you do what you need to*."

96.    In concluding the interview, Kadakia, knowing that thousands of services schedules on ClassPass do not match businesses' availability, misleadingly stated that ClassPass's recent expansion into the beauty and wellness industry allowed customers to "book things like massages, and acupuncture and other types of experiences that would have never fit into our class model before because *we now have these new experiences in different cities that people can go to*."

97.    In sum, ClassPass's scheme of listing fake "partners" extends back to its founding. It is not a unique, recent phenomenon. Nor is it limited to beauty and wellness industries, as it also extends to gyms and fitness studios.

98.    Not only was this confirmed by Kadakia's own admissions, but gyms have also related the same stories of being listed without their agreement, ClassPass refusing to remove their listing, and having customers being confused and misled by such listings.

99.    For example, one thread on Reddit shares similar experiences among gyms and fitness studios:

> I'm a gym owner and I hate ClassPass. At least in my town, it seems to cater to looky loos and people who want a cheap workout - not actually someone looking to become a member of a gym. I'd say 90% of my CP attendees would say something like, "I don't know, I had a bunch of credits expiring that I needed to use up."
>
> *I never actually signed up for CP -* in July 2020 I filled out a "contact me" form on the website, and within a few

days they had entirely setup my business on their portal. I just had to create a merchant account to get paid. It was nice that they did all the setup, but *it made me very suspicious that I never approved any of it*.. . . .

Earlier this year, I tried to cancel my affiliation with CP and it still hasn't "gone through." . . . .

*I am STILL getting reservations through CP at my old location.* Every time I bitch at them to remove me from the system, they said my account is set to expire on 9/26/2021.

It's clear that CP is just a middle-man leech on this industry. I put in the effort to create my gym, and they undercut my pricing and milk it as long as they can. *I am not surprised that they have ghost businesses. Either these ghosts are like me and have "cancelled" but CP is lazy, or other scammy shit going on.* [Expletive] ClassPass either way

100.    Another gym wrote on SiteJabber that, even after cancelling its partnership with ClassPass in 2018 and making "dozens of requests" to take the landing page down, ClassPass continued to list it with a fake schedule and incorrect address:

**DON'T get involved with this company**

★☆☆☆☆   April 7th, 2021

We cancelled our studio membership over 2.5 years ago. We STILL have people coming (wrong address since we moved) or calling in to say they have a reservation with us through ClassPass. These poor people are signing up for classes that don't even exist on our schedule anymore and pulling up to a vacant store front since we relocated 18 months ago. Despite dozens of requests over the years, ClassPass has failed to remove our studio / schedule from their portal. It's honestly shocking how poor the customer service is. It's also shady as poop that they are advertising businesses that no longer participate in their program. Run away. Do NOT get involved with ClassPass.

☆☆☆☆☆   Service
☆☆☆☆☆   Value
☆☆☆☆☆   Returns
☆☆☆☆☆   Quality

101.   Consumers, too, have been misled by fake listings of gyms and fitness studios, just as consumers have been misled by false listings of hair salons and massage spas. For instance, one Reddit user wrote, "Has anyone else had issues with a studio or salon not knowing what ClassPass is when you got there?" Another wrote in response: "Yes!! This just happened to me today and it was so confusing. ***They kept saying I needed to sign up for a membership with their gym.*** I don't understand advertising classes on ClassPass if they don't offer them?"

**B.   ClassPass Misappropriates Businesses' Names, Descriptions, and Services to Falsely Exaggerate the Size and Reach of the ClassPass Partner Network**

102.   ClassPass's listing of businesses without permission is not new, nor is it limited to the beauty and wellness industry. Rather, since its inception, ClassPass has been listing businesses, including gyms and fitness studios, without permission.

103.   ClassPass artificially inflates its Partner Network by falsely listing thousands of businesses that did not agree to being partnered or affiliated with it. It

now uses the same playbook it used in the past of listing gyms without their agreement to now expand into the beauty and wellness industries.

104.   The descriptions of these businesses on ClassPass are all substantially the same. Such listings: display stock photos; contain a paragraph using the phrase "are busy and wait times are unpredictable" or "is busy and waits [sic] times are unpredictable," a paragraph advising on the need to pay gratuity, and a generic disclaimer that "Photos are stock"; and include the company's website if available:

> **[Facial Spas/Hair Salons/Massage Spas/category of business]** are busy and wait times can be unpredictable. But getting pampered shouldn't be stressful. With ClassPass, select your preferred time and service, book online, and pre-pay using credits.
>
> . . .
>
> PLEASE READ
>
> Gratuity is not included in your reservation. Please remember to tip based on the full amount of the service reserved. Additionally, ClassPass user is responsible for any enhancements or additional services requested during the appointment.
>
> Photos are stock - please visit **[business website]** for more information.

105.   For example, Plaintiff Leeah Nails never partnered with ClassPass. Nevertheless, it was listed on the ClassPass website with a generic description and a fabricated schedule of the nail salon's supposedly available appointments, with an option to click "See Pricing" next to each service.



106.   When clicking on "See Pricing," next to the appointment, the website redirects not to Leeah Nails's price list, but, instead, to the ClassPass membership sign-up page:



107.   ClassPass's mobile application contains a similar listing for Leeah Nails:



108.   Within the application, clicking on the schedule shows a service list and purportedly available appointment times.



109.   The app promotes these appointments' availability to encourage new customers to "Start trial" or for prior customers to "Reactivate" their memberships.




110.    However, ClassPass's service listings and "available" appointments are fabrications. The availability does not reflect the actual schedules or the fact that much of these times slots are booked. In addition, many businesses have updated their websites and changed their services listings long after ClassPass initially copied their webpages.

111.    Nonetheless, ClassPass lists these services and falsely represents that ClassPass users can use credits to book such services for unavailable or non-existent time slots:



112.   Moreover, in many of these listings, ClassPass copies, verbatim, a brief description of the business from that Company, such as with Plaintiff Leeah Nails, changing "we" to "they" and "us" to "them":



*ClassPass Listing*



*www.leeahnails.com*

113.   Plaintiff Rapha Massage also never partnered with ClassPass. Yet ClassPass also copied language from Rapha Massage's description on its website, changing "We tailor . . ." to "They tailor . . .":



*ClassPass Listing*



*www.rapha-massage.com*

114.   And Plaintiff Salon Phoenix never partnered with ClassPass. Yet ClassPass also did the same with Salon Phoenix, copying language from the website, changing the perspective from first to third person:



11/14/21, 10:15 AM                                        Salon Phoenix: Read Reviews and Book Classes on ClassPass

**Salon Phoenix**
☆ ☆ ☆ ☆ ☆

Hair Salons are busy and wait times can be unpredictable. But getting pampered shouldn't be stressful. With ClassPass, select your preferred time and service, book online, and pre-pay using credits.

Their attention is always on you, they never double book clients. Their goal is to create a sophisticated yet relaxed environment for their clients.

Book a spot at Salon Phoenix today.                                                                    ✕

*ClassPass Listing*



SALON PHOENIX IS MY PRIVATE STUDIO—

MY ATTENTION IS ALWAYS ON YOU; I NEVER DOUBLE BOOK CLIENTS

MY GOAL IS TO CREATE A SOPHISTICATED YET RELAXED ENVIRONMENT FOR MY CLIENTS

I CAN'T WAIT TO MEET YOU!

*www.makehairhappy.com/studio-tour*

Waxing Salons are busy and wait times can be unpredictable. But getting pampered shouldn't be stressful. With ClassPass, select your preferred time and service, book online, and pre-pay using credits.

They have taken the facial out of the dark spa room and into the light. They are an open-minded, open atmosphere day spa customizing 30-minute facial treatments, peels, facial waxing and lash or brow services.

PLEASE READ
Gratuity is not included in your reservation. Please remember to tip based on the full amount of the service reserved. Additionally,

115.   Nor did Plaintiff The Facial Bar partner with ClassPass, yet ClassPass did the same with The Facial Bar:

We have taken the facial out of the dark spa room and into the light!  We are an open-minded, open atmosphere day spa customizing in 30 minute facial treatments, peels, facial waxing and lash/brow services.

*www.facialbarkc.com/about*

116.   Further, ClassPass regularly fails to edit these listings for grammar, littering businesses with landing pages containing descriptions like grammatical failures like "Massage Spa is busy and waits times can be unpredictable":

> Massage Spa is busy and waits times can be unpredictable. But getting pampered shouldn't be stressful. With ClassPass, select your preferred time and service, book online, and pre-pay using credits.

117.   As stated above, there are thousands of falsely listed ClassPass affiliates online. And just a simple search of the ClassPass website demonstrates that in all major markets, and even smaller locations, ClassPass contains dozens, hundreds, or even thousands of false listings. The following illustrates results for just a small selection of ClassPass "partners" in the New York region:



118.   As of November 1, 2021, out of the claimed 20,000 partners in the "beauty and wellness" category alone, nearly 7,500 of ClassPass's business listings fit the pattern of those ClassPass listed without permission.

119.   The following chart illustrates the significant percentage and number of "beauty and wellness" pages on ClassPass that fit in the pattern of false listings:

| Region | Total Listings | False Listings | Percentage |
|---|---|---|---|
| New York City | 3,617 | 1,927 | 53.28% |
| Phoenix | 1,608 | 1,084 | 67.41% |
| Orlando | 782 | 603 | 77.11% |
| Jacksonville | 658 | 490 | 74.47% |
| Denver | 575 | 299 | 52.00% |
| San Antonio | 338 | 283 | 83.73% |
| Tampa | 920 | 233 | 25.33% |
| Philadelphia | 402 | 225 | 55.97% |
| Houston | 520 | 192 | 36.92% |
| Salt Lake City | 311 | 183 | 58.84% |
| Madison | 225 | 182 | 80.89% |
| Pittsburgh | 253 | 172 | 67.98% |
| Boston | 359 | 136 | 37.88% |
| Baltimore | 171 | 112 | 65.50% |
| Minneapolis | 192 | 104 | 54.17% |
| Chicago | 446 | 100 | 22.42% |
| Charlotte | 142 | 93 | 65.49% |
| Portland | 179 | 87 | 48.60% |
| Cleveland | 185 | 85 | 45.95% |
| Bridgeport | 88 | 80 | 90.91% |
| Sacramento | 112 | 74 | 66.07% |
| Kansas City | 94 | 73 | 77.66% |
| Inland Empire | 102 | 72 | 70.59% |
| Miami | 546 | 72 | 13.19% |
| Detroit | 109 | 67 | 61.47% |
| Las Vegas | 99 | 67 | 67.68% |
| Nashville | 134 | 56 | 41.79% |
| Seattle | 273 | 47 | 17.22% |
| Dallas | 195 | 46 | 23.59% |
| Washington | 287 | 41 | 14.29% |
| St. Louis | 49 | 31 | 63.27% |

| | | | |
|---|---|---|---|
| *Austin* | 155 | 27 | 17.42% |
| *Charleston* | 150 | 27 | 18.00% |
| *New Orleans* | 86 | 26 | 30.23% |
| *Los Angeles* | 169 | 22 | 13.02% |
| *San Francisco* | 199 | 21 | 10.55% |

120.   These statistics are based only on descriptions that contain language that fit the pattern described above, including the "busy and wait times" language. However, upon information and belief, the exact number is likely far higher.

121.   Upon information and belief, and as Defendant Kadakia has admitted (as discussed next), ClassPass has been listing businesses without their permission for years, including gyms and fitness studios. Moreover, other listings contain stock photos and may only have a warning about gratuity not being included with service, suggesting these, too, may represent businesses that ClassPass listed without permission.

### C.   ClassPass Lists Plaintiffs Without Their Permission

122.   Plaintiffs did not agree to be listed with ClassPass. They did not agree that ClassPass could copy their websites, list a "schedule" of their services, and book appointments on behalf of other customers. Plaintiffs further did not agree that ClassPass could use their names and services to sell ClassPass memberships and credits.

### i)   Leeah Nails

123.   On September 1, 2021, a customer came to Plaintiff Leeah Nails's store and received the "Gel Manicure and Spa Pedicure" service.

124.    After she received the service, Leeah Nails asked for payment. Confused at this request, the customer claimed she had already paid for the service because she booked it using ClassPass.

125.    The customer's booking confirmation on her phone demonstrated that she used 16 credits to book the service. ClassPass had only advised her that gratuity was not included:



126.    But Leeah Nails did not have any relationship with ClassPass; the owner of Leeah Nails had not even heard about ClassPass before this incident.

127.    A ClassPass representative had previously called the receptionist at Leeah Nails to book a reservation, promising he would follow up to pay. The receptionist had not heard of ClassPass, but because callers sometimes book services on other's behalf, this did not raise concerns at the time.

128.   Leeah Nails's online booking system also showed that a reservation had been made for this customer but that there was no prepayment.

129.   Leeah Nails apologized to the customer for the confusion and charged her the regular price of service. While she was upset, the customer still paid in full.

130.   The customer shared this experience on TrustPilot.com, writing that she was "scammed":



131.   Later, Leeah Nails attempted to call back the customer on the number used to reserve the service through its online booking platform. However, this phone number went directly to a ClassPass employee.

132.   Leeah Nails thereafter discovered ClassPass had listed it on the ClassPass Partner Network and even listed Leeah Nails's service offerings and a schedule.

133.   Leeah Nails did not write the business description that is displayed on ClassPass, nor did Leeah Nails ever upload its appointment schedule. Indeed, the appointment slots that ClassPass listed as being available are false and inaccurate—Leeah Nails does not schedule services for every half hour, and ClassPass shows available time slots that have already been booked.

134.   Leeah Nails contacted ClassPass customer service multiple times, but they refused to assist on the grounds that Leeah Nails did not have an account with ClassPass.

135.   Although the customer that came to Leeah Nails through ClassPass ultimately paid full price for the service, Leeah Nails does not want customers to have a negative experience at its business. Indeed, the disgruntled customer has not returned for additional services.

136.   The owner of Leeah Nails did basic research and quickly discovered that countless other businesses had similar generic descriptions on ClassPass. The owner spoke to five other businesses with the same descriptions and confirmed that none had any relationship with ClassPass. Indeed, all five other businesses were unaware that ClassPass was listing their businesses and services.

137.   Leeah Nails never agreed to Defendants' use of its business information and list of services.

138.   Leeah Nails contacted ClassPass multiple times after the incident at its store on September 1, 2021, but ClassPass refused to remove the listing. Only after Leeah Nails filed suit on October 22, 2021, did ClassPass finally take down the landing page.

139.   Leeah Nails never agreed to ClassPass's copying, verbatim, the description from its website.

140.   Leeah Nails fears that ClassPass is taking away potential customers. Individuals that are interested in booking Leeah Nails's services may click to register through ClassPass. ClassPass uses this as an opportunity to sell ClassPass memberships or to sell additional credits to ClassPass members.

141.   Leeah Nails also fears that it will be forced to use ClassPass to attract customers, and, as a result, ClassPass will drive down Leeah Nails's margins to unsustainable rates. Leeah Nails is concerned that the false listing of hundreds of partners in the ClassPass Partner Network will eventually force it to sign up with ClassPass and take the discounted rates or risk losing customers who wish to use ClassPass to book services because of the wide offerings of the ClassPass Partner Network.

### ii)    Salon Phoenix

142.   Plaintiff Salon Phoenix shares these concerns. It never agreed to ClassPass's listing, nor did it agree to ClassPass's copying, verbatim, of the description from its website.

143.   On November 9, 2021, ClassPass reached out to Salon Phoenix to try to convince it to partner with ClassPass. Without disclosing that ClassPass had already

listed it on its website, a ClassPass representative wrote: "I was browsing your services online and saw you had your own salon suite and work by appointment only."

144.    Salon Phoenix does not want to be listed with ClassPass. It prides itself on its reputation of being a high-end, luxury salon and does not wish to be affiliated with discounted membership programs. Indeed, it does not discount its services. Moreover, it processes all bookings through its website and requires credit card information, among other personal details, to hold an appointment.

145.    Salon Phoenix fears that its hard-earned reputation will be damaged by ClassPass's listing with stock photos and fake appointment times, which are inconsistent with the reputation Salon Phoenix has worked hard to develop. Moreover, Salon Phoenix fears that customers may book services through ClassPass that it cannot accommodate. It does not want customers to show up for a booked service at a time that does not exist, blame the salon, and leave a negative review online.

146.    Indeed, ClassPass has put Salon Phoenix at risk for these problems even though it is aware that this is something the salon explicitly prides itself on preventing. Salon Phoenix's website emphasizes: "I NEVER DOUBLE BOOK CLIENTS." ClassPass copied this on the fake listing and changed it to "***they*** never double book clients." Yet the ClassPass listing contains a fabricated service schedule that shows time slots that do not exist or availability when Salon Phoenix is already booked.

147.    Salon Phoenix similarly suffers reputational harm as a result of its false connection with ClassPass due to the fact that Salon Phoenix's ClassPass landing page appears on the first page of Google search results for the business:



### iii)    Rapha Massage

148.    Plaintiff Rapha Massage shares these concerns. It never agreed to ClassPass's listing, nor did it agree to ClassPass's copying, verbatim, of the description from its website.

149.   Rapha Massage also fears that ClassPass's landing page and incorrect listings of its service availability could jeopardize the safety and health of its customers and staff. Rapha Massage only accepts customers who book through its website and complete an intake form to protect against the spread of COVID-19. It also screens for potential medical issues that could affect the massage treatment.

150.   In addition, due to past experiences, Rapha Massage must strictly screen potential customers to avoid those who are searching for sexual services. Indeed, it previously partnered with Groupon. However, after a Groupon customer requested sexual services in the middle of a massage and made the therapist fear for her safety, Rapha Massage ended its partnership with Groupon. Because of this incident, Rapha Massage implemented a system in which it strictly screens all potential customers. It does not want ClassPass to send unsolicited customers to its business.

### iv)   Midvalley Massage

151.   Plaintiff Midvalley Massage shares these concerns. It never agreed to ClassPass's listing, nor did it agree to ClassPass's copying, verbatim, of the description from its website.

152.   It also previously rejected ClassPass's entreaties that it be listed on ClassPass. In June 2021, a ClassPass representative called Midvalley Massage to promote a partnership. Midvalley Massage researched ClassPass and discovered that ClassPass Subscribers were unhappy with the service and were stuck in contracts they wished to leave. Therefore, when ClassPass called Midvalley Massage again to partner with it, Midvalley Massage declined.

153.   The ClassPass representative followed up with two emails. Midvalley Massage did not respond.

154.   During these entreaties for Midvalley Massage's business, ClassPass never disclosed to Midvalley Massage that, all along, it had listed its business and services on ClassPass's website and app. Midvalley Massage only recently discovered its own listing.

155.   Midvalley Massage also fears for the safety of its staff. It conducts a rigorous screening of all potential customers and obtains credit card information to ensure that customers are not sexual solicitors or internet scammers.

156.   Midvalley Massage also takes pride in how it advertises its business online. Moreover, for safety reasons, businesses in the massage industry must maintain clear and precise language in its advertising so as to not accidentally attract sexual solicitors.

### v)   The Facial Bar

157.   Plaintiff The Facial Bar shares these concerns. It never agreed to ClassPass's listing, nor did it agree to ClassPass's copying, verbatim, of the description from its website. The Facial Bar fears for its reputation, as its landing page and stock photo on ClassPass are well below the high standards of its brand. The Facial Bar also does not want ClassPass to create unnecessary and burdensome issues for itself and its customers, who may book unavailable services through ClassPass.

158.   The Facial Bar was unaware of its ClassPass listing until a ClassPass representative, who only identified themself as a "personal assistant," attempted to

book a reservation on the customer's behalf. The Facial Bar was concerned that its customer's information had been taken by a scammer. Accordingly, it reached out to the customer, who confirmed that she had tried to book through ClassPass:



### vi)   Salon Goldyn

159.   Plaintiff Salon Goldyn shares these concerns. It never agreed to ClassPass's listing and explicitly and repeatedly declined ClassPass's request that

Salon Goldyn partner with ClassPass. Despite this clear communication, Salon Goldyn is still listed on ClassPass.

160.   Salon Goldyn also fears that ClassPass will endanger its clients and staff. To prevent the spread of COVID-19, Salon Goldyn absolutely does not want customers to show up early, yet ClassPass tells customers to arrive 15 minutes in advance:



161.   Salon Goldyn has already had to deal with the aftermath of multiple frustrated and upset customers who either booked unavailable appointments through ClassPass or who booked the salon's services on the salon's website yet still attempted to use ClassPass credits to pay.

162.   As just a few examples of confused customers, one wrote Salon Goldyn in February 2021:

> Hi, I see that you guys are on classPass but when I called the other day, the stylist said she had never heard of it. I'm including a picture so you can see.

163.   Another messaged, "I wanted to confirm my ClassPass Booking on Thurs July 22 at 1:30pm for a Men's Cut."

### vii)   Hairroin Salon

164.   Plaintiff Hairroin Salon shares these concerns. It never agreed to ClassPass's listing and explicitly and repeatedly denied ClassPass's request that it partner with it.

165.   Hairroin Salon did not realize that ClassPass was listing it until after a customer received a nail service and then claimed she paid through ClassPass.

166.   The appointment was booked online using an invalid credit card, as the charge was declined. The phone number and email address reserving the booking were contacts at ClassPass, but after leaving a voicemail and sending an email, Hairroin Salon did not receive a response.

167. Hairroin Salon was eventually able to reach ClassPass through representatives that had tried to convince it to join ClassPass as a partner. Hairroin Salon describes ClassPass's deceptive response as gaslighting:

- ClassPass wrote that it was going to "close out *your account* with ClassPass."

- The salon responded: "We never had a Classpass account and we had a client come in and try to pay with a Classpass credit just today. . . *we never came to an agreement and signed anything*."

- ClassPass still would not provide an honest response, instead answering: "It *appears* that your salon was showcased by ClassPass Appointment Assistant."

- ClassPass further claimed: "We will never send a customer your way without *explicitly sharing* they are from ClassPass and *always pay* the full retail value for these services."

- However, the salon corrected ClassPass's false claims: "We called the number attached to the appointment and no one answered or returned our call. Since *we could not process the payment*, the client was required to then pay for her service out of pocket. . . . The appointment in question was *not made over the phone*, it was an online booking."

168. Hairroin Salon's landing page on ClassPass has since been taken down. Nevertheless, months later, on November 9, 2021, ClassPass emailed the salon asking it to partner with it, now actually asking for permission, writing: "We *can* list your available appointments to our users, connecting you to new clientele and another source of revenue!"

169. Hairroin Salon explained it had no interest in partnership due to the "negative experience" it had with the customer and that ClassPass is "not the kind of business we think would benefit us."

170.   ClassPass replied that "we previously had you on our concierge program . . . [which] is a way for our clients to test different salons and venues **_not currently partnered_** with ClassPass." After no response, the ClassPass representative wrote further:

> I haven't heard back from you and **_we had a few clients reach out to me to see if we could bring you on ClassPass as a partner_** and start sending some of them into any of your open times. I'd love to get you set up before the Holidays but if not no worries I can reroute them to another Salon.

171.   Hairroin Salon is a high-end salon and fears that being affiliated with ClassPass will damage its reputation.

172.   In addition, ClassPass's listing harmed relations between staff and management. Hairroin Salon prides itself on its open communication and its staff. When its stylists discovered that Hairroin Salon was on ClassPass, it created a rift of distrust among its team. Employees believed the business must have been struggling financially, as stylists found that their high-end salon was on a discount site designed for gyms and studios.

173.   In addition, Hairroin Salon gives its stylists the options to participate in promotions if they so choose, yet the stylists, just like Hairroin Salon, had no advance notice that ClassPass was listing the business and "booking" its services.

174.   As a result, ClassPass caused Hairroin Salon to lose the trust of both its staff and clientele.

### D.   ClassPass Targets Businesses to Promote the Benefits of Partnerships Without Informing Them They Are Listed

175.   As part of this deception, ClassPass representatives reach out to businesses to try to convince them to partner with it. ClassPass never discloses that, despite a lack of previous communication, it had already listed the businesses' services online and was attempting to use those listings to sell ClassPass memberships and credits to ClassPass Subscribers.

176.   For instance, similar to Plaintiff Midvalley Massage's experience, one business shared that, for months, ClassPass representatives aggressively called and emailed the business, in order to try to establish a partnership. ClassPass sent a litany of promotional brochures and mailings that touted the benefits of being listed with ClassPass.

177.   The business responded by telling ClassPass it was not interested because it wanted strict control over its online and social media presence and that it values a personalized customer experience. ClassPass subsequently contacted the business, claiming that it had customers who wanted to book its services. Throughout this lengthy solicitation process, ClassPass never disclosed that, all along, it had been listing the business on ClassPass without the business's permission.

178.   Online complaint forums are awash with businesses relating similar experiences. For example, in response to a Reddit thread from users who shared their confusion about fake listings and cancelled appointments, one wellness center wrote:

> One reason this happens is because CP creates fake accounts for businesses - I know because they did it to my wellness center. ***Reps got in touch multiple times, I***

> ***always declined*** - I randomly received a "summary of
> activity" email & saw that an account was opened for our
> business (not just a page with our info, but a whole
> dashboard).

179.   Another business responded:

> Classpass is putting businesses on their site WITHOUT
> the businesses permission. It is happening with the spa I
> work at. Their reps have called us multiple times and we
> tell them every time that we are NOT interested. Only to
> find out that our site and services are listed on Classpass.
> Shady shady shady [expletive] company.

## E.   ClassPass's Conduct Has and Will Continue to Harm Plaintiffs and Other Businesses

180.   Plaintiffs are concerned that ClassPass's listing and fake service schedule will injure their reputations, including, among other concerns, by, among other harms, (1) affiliating them with a company that takes advantage of its customers and engages in unethical billing practices, (2) burdening them with upset customers, negative reviews and costing them money, and (3) confusing their existing or potential customers.

### i)   ClassPass's False Affiliation of These Businesses Injures Their Reputations

181.   ClassPass has poor ratings online, and consumers are reporting that ClassPass is charging for memberships without consent. Plaintiffs do not want the public to believe that they are associated with ClassPass in any way.

182.   Indeed, ClassPass Subscribers are widely unhappy with it. Shortly after June 2021, when Defendant Lanman announced that 90% of ClassPass Subscribers had resumed paying for their subscriptions—as these memberships had been paused

in Spring 2020 due to COVID-19—hordes of ClassPass members were unaware that the charges had restarted.

183.   ClassPass has a two-star rating on Trustpilot.com, based on 6,945 reviews, with numerous reviews around September 2021 from Subscribers reporting that they discovered ClassPass started charging them again for subscriptions they believed had been canceled or paused. For example, on September 26, 2021, one customer related:

> ***Same exact bull as everyone else on here***. At the start of the pandemic I tried to cancel my classpass plan for obvious reasons... with no luck. The best I was able to do was "pause my account" and get 0 credits for 0$ a month. Sometime in May they started charging my account again... didn't notice until last month when I finally logged on and canceled - only to see that they charged me AGAIN this month. I will go through my credit card company and most likely get the money back because I saved all the documentation (thankfully), but a huge hassle and NOT what I want to spend my Sunday doing. The fact that everyone else has been having the same problem is more than a coincident [sic].

184.   Complaints to the Better Business Bureau—where ClassPass has a dismal 1.18 rating—also relate the same experiences of unwanted charges and bills. So too on Yelp and at least two other complaint forums, www.sitejabber.com and www.complaintsboard.com.

185.   Reddit, too, is awash in similar experiences, as exemplified by one thread from August 2021:

> ClassPass charged me for 5 months when my account was paused and billing was "paused". Happened to a few of my

friends too and they ended up having to file for fraudulent charges with their credit card companies. ***When I emailed customer service, they denied it, and updated the plan on my account to remove language stating billing is paused, which is super shady.*** They then said they would only look into it if I could provide proof of paused billing. Luckily I took a screenshot before they updated my account so I was able to confront them about the deceptive change they made, and then they refunded me.

186.   ClassPass also injures businesses' reputations by marketing them in ways that are inconsistent with or harmful to those businesses' established brands.

187.   For example, without the business's permission, ClassPass created a landing page for a Jewish Community Center advertising massages with an image of an undressed woman. This image is inconsistent with the community center's purpose and image of "[e]nriching the life of the Jewish community and the community at large by offering educational, cultural, and recreational opportunities in a place where people of all backgrounds, cultures and beliefs gather in peace and understanding":



ii)     Customers "Booking" Reservations Through
        ClassPass Also Harms Businesses

188.   ClassPass's conduct harms businesses' reputations because ClassPass lists fabricated availability times and stale services from when it initially copied any business's website. Confused customers blame the business for the negative experience by faulting the business for being listed on ClassPass yet not accepting their reservations.

189.    For example, multiple Yelp reviewers in New York alone have left one-star reviews following such an episode:







190.    In addition to reputational harms, ClassPass is costing businesses money.

191.    While Leeah Nails was able to secure payment for the services, other businesses have not been so fortunate. For example, as reported by a local Bay Area news station in October 2021, a customer came to a salon but the owners never heard of ClassPass. The customer "showed [the owner] the app and it showed tons of lists

of times for available cuts and color." However, the business remarked that "[t]hose kinds of appointments don't exist at all."

192.    The business also related that the customer was so upset, the business offered her a free treatment, and advised other businesses that "you don't want to be in these situations where people come in upset with you."

193.    As yet another example, one massage spa had a customer arrive just as the spa was about to close, claiming she booked through ClassPass. The business, which had no idea that ClassPass had listed it, extended its therapist's hours that day to accommodate the customer. After the fact, ClassPass emailed the business, revealing that ClassPass had been listing it and booking services for it all along, and brazenly seeking to get the business to agree to being an actual ClassPass partner.

194.    Other businesses that ClassPass falsely lists as part of its network share these concerns and are upset that ClassPass has listed them without permission. For instance, a spa owner went online to complain about ClassPass falsely listing its business, explaining that it "never joined class pass" but "people are buying my spa pedicure services through this."

195.    Another complained online to the Better Business Bureau, writing:



Complaint Type: Problems with Product/Service      Status: Resolved ⓘ

09/14/2021

I own ***************************** in ***********, **. ClassPass, Inc. has listed my business on their website and are collecting money and offering appointments to their clients through their membership service. I have not given them permission to list my business, schedule clients through this service, or collect money on my behalf. It is a scam. Others in my community have been listed as well without their permission. I sent an email to ClassPass, asking them to take my business off their site immediately.

196.    One medical clinic took to SiteJabber (a reviews website) in May 2021 to express frustration with being listed without knowledge or consent:



**Falsified my business!**

⭐☆☆☆☆   April 1st, 2021

ClassPass created a profile of my business, a medical clinic, and began allowing people to book appts WITHOUT ME KNOWING! I had never even heard of ClassPass until someone called confirming they had an appt with me? I was stunned- they copied info from my website and began offering my services?! This company needs to be looked at from a legal standpoint, I don't know how they're still operating.

197.    Businesses have also reported that ClassPass has not removed their listings even when requested. As one business wrote on May 29, 2021 on SiteJabber:

> Our business has NO association with ClassPass yet they have posted our business on their site implying that we honor their point discounts. This is clearly unethical and probably illegal as false or misleading advertising yet they have done this with numerous businesses. ***We have tried to contact ClassPass management to complain*** but each time we are get passed off to numerous persons who have nothing to do with marketing or advertising and when we try to contact upper management we are told nobody is available. We do not honor ClassPass discounts and refuse service to persons who are so misled. I feel bad for those who have been sucked into this scam.

198.    Indeed, even when businesses initially agree to partner with ClassPass, later many have found that ClassPass has neither brought them new customers nor increased revenues.

199.    As reported in Vice, *ClassPass Is Squeezing Studios to the Point of Death* (Feb. 6, 2020),[1] studios complain that ClassPass has driven down the rates at which they can offer their services to below sustainable levels, yet the size of ClassPass's customer base forces the partnership to continue partnering with ClassPass. Businesses eventually have no choice but to accept ClassPass's reduced rates because they cannot compete with ClassPass to attract customers separately.

200.    In the words of one studio, ClassPass has created a situation for ClassPass partners where "we are damned if we do and damned if we don't."

201.    Indeed, ClassPass acts more like a competitor than a partner to those in the ClassPass Partner Network. As Vice explained:

> [A]fter wiggling its way inside thousands of studios, the system had nonetheless begun to seem like . . . not so much a partner as a competitor—one that had control over the rules of the game. . . . On its website, ClassPass proudly boasts that customers can 'save up to 70% off drop-in rates.' "'Sweat your workouts – not their prices,'" the company says.
>
> Meanwhile, ClassPass partners can't make the same comparisons. The company makes partners agree that the terms of their deals "will never be visible to ClassPass users," according to one partner agreement, and requests that partners never target ClassPass customers with promotions, "undercut ClassPass pricing" or "make any comparative references to ClassPass," according to its terms and conditions.

---

[1] https://www.vice.com/en/article/xgqgaw/classpass-is-squeezing-studios-to-the-point-of-death

202.    ClassPass has also taken customers from businesses that partner with it. For instance, customers that previously booked classes directly from studios now use ClassPass to book the same classes because of ClassPass's discounted rates. In the words of one business owner, "[ClassPass has] taken control . . . essentially renting out spots in our classes and making the customers their customers, not our customers."

### F.    ClassPass's Conduct Misleads, Confuses, and Harms Countless Individuals, Substantially Injuring the Public Interest

203.    The internet is replete with individuals who have been misled and confused by ClassPass's fake listings. For instance, a user took to Reddit asking "[i]s anyone else having the issue of ghost studios? I'm running into classes or beauty appointments where the studio isn't real or they cancel 15 mins before an appointment, which it usually requests me to get there 15mins before my class or appointment?"

204.    Other Reddit users have confirmed similar experiences. In July 2021, a user wrote, "Has anyone else had issues with a studio or salon not knowing what ClassPass is when you got there?," and the post received responses echoing similar experiences.

205.    Another user wrote on Influenster in late 2020 that: "Class pass is the WORST! *Not only do they have listings for places that don't even accept classpass but they have listings for classes that aren't even happening*! Classpass is so unreliable and I wouldn't recommend it to anyone."

206.   Indeed, ClassPass's fake listings has put individuals in dangerous situations, as exemplified by one user who wrote twice about her experiences in mid-October:

> **_Fraud, Fake Business Schedules, Danger_**
>
> ClassPass lists businesses that have not given their permission to be listed. They have never partnered with ClassPass, and are often unaware ClassPass even exists. I have collected a list of these businesses, and contacted them myself, because I was confused why my appointments booked through ClassPass kept getting canceled. Turns out they post the business information and fake schedules available for booking on the ClassPass app, in hopes emails of these appointments will garner them business. Instead, **_it reflects badly on the business because of all the last-minute cancelled appointments_**, **_and is a nightmare for the ClassPass user, who thinks they're booking a real appointment, changes around their schedule, only to get cancellation after cancellation_**. This is what has been happening to me. I asked for a refund, and ClassPass customer service (email only) sends me the same generic messages over and over and is no help. Then this past weekend, I booked three appointments, just trying to use up my credits with ClassPass so I can cancel for good, and I showed up to a massage at 8 PM at a business complex in the dark. My car was the only one in the lot, and I wandered the outdoor complex corridors looking for the business.[] I got to the door, and it was locked. **_The business had been closed for hours. ClassPass booked me a fake appointment, and put me in a very dangerous situation as a woman wandering around at night_**. I showed up to another business for two appointments the next day, and they were closed too. I reported both situations immediately to ClassPass customer service.
>
> . . .
>
> I started calling these places to confirm my appointment, because I was organizing my work schedule and my days

around these appointments, and it was so frustrating that they kept getting canceled. And I was horrified to hear that these businesses had never partnered with ClassPass. ***The business owners were telling me it was a scam, and they were sorry, but of course they never got my appointment, because they do not partner with ClassPass and would have no way to receive payment from them***. . . . Call the places when your appointment is cancelled and ask if they partner with ClassPass. I emailed ClassPass customer service (they don't have a phone number), and they've sent me this generic message over and over that they're sorry my appointment was canceled by the partner, that I've been credited, and refunds aren't possible. ***They don't address at all the fact that they are advertising businesses without their permission, and that the appointments people are booking do not exist and will always get canceled***. The credits are therefore impossible to use, will keep getting refunded, and will expire after the next billing cycle. I just want to use the credits and cancel my membership with ClassPass forever.

207.   In response, ClassPass did not acknowledge that it was posting fake schedules for the businesses or provide any explanation for how the systemic problems occurred. While ClassPass refunded the credits for the appointments that never took place, the repeated cancellations and ClassPass's restrictive credit rollover policy deprived the Subscriber of the benefits of the membership.

208.   ClassPass similarly engages in misdirection when it is unable to book an appointment for a business that it lists without its permission. As part of its message notifying the Subscriber that the appointment was cancelled, ClassPass tells the customer that the credits have been refunded and that they can use those credits to reschedule their appointment at that very same business. In reality, this only compounds the problem:



## CLASS ACTION ALLEGATIONS

209.   Plaintiffs bring this action on behalf of themselves and on behalf of the

following class (the "Nationwide Class"), defined as follows:

> All persons or entities in the United States that ClassPass has listed on its website and/or app through the creation of a business landing page, and that did not agree to be a ClassPass partner, and/or such subclasses as the Court may deem appropriate.

210. Plaintiffs Leeah Nails and Phoenix Salon also bring this action on behalf of themselves and on behalf of the following class (the "New Jersey Class"), defined as follows:

> All persons or entities in New Jersey that ClassPass has listed on its website and/or app through the creation of a business landing page, and that did not agree to be a ClassPass partner, and/or such subclasses as the Court may deem appropriate.

211. Plaintiff Rapha Massage also brings this action on behalf of itself and on behalf of the following class (the "Connecticut Class"), defined as follows:

> All persons or entities in Connecticut that ClassPass has listed on its website and/or app through the creation of a business landing page, and that did not agree to be a ClassPass partner, and/or such subclasses as the Court may deem appropriate.

212. Plaintiff Midvalley Massage also brings this action on behalf of itself and on behalf of the following class (the "Utah Class"), defined as follows:

> All persons or entities in Utah that ClassPass has listed on its website and/or app through the creation of a business landing page, and that did not agree to be a ClassPass partner, and/or such subclasses as the Court may deem appropriate.

213.   Plaintiff The Facial Bar also brings this action on behalf of itself and on behalf of the following class (the "Missouri Class"), defined as follows:

> All persons or entities in Missouri that ClassPass has listed on its website and/or app through the creation of a business landing page, and that did not agree to be a ClassPass partner, and/or such subclasses as the Court may deem appropriate.

214.   Plaintiff Salon Goldyn also brings this action on behalf of itself and on behalf of the following class (the "Colorado Class"), defined as follows:

> All persons or entities in Colorado that ClassPass has listed on its website and/or app through the creation of a business landing page, and that did not agree to be a ClassPass partner, and/or such subclasses as the Court may deem appropriate.

215.   Plaintiff Hairroin Salon brings this action on behalf of itself and on behalf of the following class (the "California Class"), defined as follows:

> All persons or entities in California that ClassPass has listed on its website and/or app through the creation of a business landing page, and that did not agree to be a ClassPass partner, and/or such subclasses as the Court may deem appropriate.

216.   Excluded from the proposed Classes are Defendants, its parents, subsidiaries, officers, directors, and any entity in which Defendants have a controlling interest.

217.   Plaintiffs reserve the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

218.   The claims of all class members derive directly from a single course of conduct by the Defendants. Defendants have engaged and continue to engage in uniform and standardized conduct toward the class members.

219.   Certification of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of Plaintiffs' claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

220.   Accordingly, Plaintiffs bring this lawsuit as a class action on Plaintiffs' own behalf and on behalf of all other business, entities, and individuals similarly situated pursuant under Fed. R. Civ. P. 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these provisions.

221.   Specifically, this action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

222.   **Numerosity** (Fed. R. Civ. P. 23(a)(1)). The members of the proposed Classes are so numerous that their individual joinder would be impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery, and it is believed the class includes many thousands of members. The precise number of class members, and their addresses, are unknown to Plaintiffs at this time, but can be ascertained from Defendants' records.

223. **Ascertainability**. The Classes are ascertainable because their members can be readily identified using business records, and other information kept by Defendants in the usual course of business and within their control or Plaintiffs and the class members themselves. Plaintiffs anticipate providing appropriate notice to the Classes to be approved by the Court after class certification, or pursuant to court order.

224. **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2); 23(b)(3)). Common questions of law and fact exist as to all class members. These questions predominate over the questions affecting only individual class members. The common legal and factual questions include, without limitation:

(a) whether Defendants obtained class members' permission before listing them on Defendants' website or app;

(b) whether Defendants artificially inflated the purported size of the ClassPass Partner Network;

(c) whether Defendants targeted clients of the class members and unfairly, unethically, unlawfully, falsely, fraudulently, deceptively, misleadingly, unconscionably, and/or confusingly redirected them to become ClassPass Subscribers;

(d) whether Defendants otherwise engaged in unfair, unlawful, fraudulent, unethical, unconscionable, and/or deceptive trade practices;

(e) whether Defendants violated the applicable statutes identified herein;

(f) whether consumers are likely to be misled by Defendants' conduct;

(g) whether Defendants concealed material facts in their advertising materials and/or failed to adequately disclose material facts;

(h) whether Plaintiffs and the Classes are entitled to actual, compensatory, nominal, statutory, enhanced, and/or punitive damages;

(i) whether Plaintiffs and the Classes are entitled to injunctive, declaratory relief, or other equitable relief;

(j) whether Plaintiffs and the Classes are entitled to civil penalties; and

(k) whether Plaintiffs and the Classes are entitled to reasonable attorneys' fees and costs.

225.   **Typicality of Claims** (Fed. R. Civ. P. 23(a)(3)). The claims of the Plaintiffs and the respective Classes are based on the same legal theories and arise from the same unlawful and willful conduct of Defendants, resulting in the same injury to the Plaintiffs and Classes. Plaintiffs and all class members are similarly affected by Defendants' wrongful conduct and were damaged in the same way. Plaintiffs' interests coincide with, and are not antagonistic to, those of the other class members. Plaintiffs have been damaged by the same wrongdoing set forth in this Complaint.

226.   **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)). Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the class members, and they have retained counsel competent and experienced in complex class action, business competition, and consumer litigation.

Plaintiffs and their counsel will fairly and adequately protect the interest of the class members.

227.   **Superiority of a Class Action** (Fed. R. Civ. P. 23(b)(3)). A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and class members. There is no special interest in class members individually controlling the prosecution of separate actions. The damages suffered by individual class members, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. Further, it would be virtually impossible for the class members individually to redress effectively the wrongs done to them. And, even if class members themselves could afford such individual litigation; the court system could not, given the thousands of cases that would need to be filed. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

228.   **Appropriateness of Final Injunctive or Declaratory Relief** (Fed. R. Civ. P. 23(b)(2)). In the alternative, this action may properly be maintained as a class action, because:

(a)   the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for

Defendants; or

   (b) the prosecution of separate actions by individual class members would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

   (c) Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Classes as a whole.

### FIRST CAUSE OF ACTION

**Unfair Competition, False Affiliation, and Reverse Passing Off in Violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)**
**(On Behalf of Plaintiffs and the Nationwide Class)**

229. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

230. Defendants' conduct as set forth herein significantly impacts interstate commerce and commerce within this district.

231. Section 43 of the Lanham Act provides liability as to

> Any person . . . who uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin,

- 67 -

sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities. . . .

232.    As described more fully herein, Defendants have engaged in a course of conduct with respect to the advertising of their ClassPass Partner Network that unfairly and falsely affiliates Plaintiffs and class members with Defendants, diverting potential customers into purchasing ClassPass memberships.

233.    This conduct has caused, and is likely to cause, mistake and deception as to the affiliation, connection, or association of Plaintiffs and the other class members.

234.    Through this conduct, ClassPass also misrepresents the nature and characteristics of its ClassPass Partner Network.

235.    This course of conduct includes, but is not limited to, the following:

(a)    confusing, or likely confusing, potential customers about the existence of any affiliation between Plaintiffs and class members with ClassPass and the ability to book their services through ClassPass;

(b)    misrepresenting that Plaintiffs and the class members have partnered with ClassPass and are part of its Partner Network;

(c)    misrepresenting that the services offered by Plaintiffs and the class members may be booked through ClassPass;

- 68 -

(d)    misrepresenting the schedules of services offered by Plaintiffs and class members;

(e)    misrepresenting the size and reach of the ClassPass Partner Network to entice individuals to purchase ClassPass memberships;

(f)    failing to inform ClassPass Subscribers that Plaintiffs and the class members do not belong to the ClassPass Partner Network;

(g)    failing to inform ClassPass Subscribers that ClassPass credits cannot be used to pay for services rendered at Plaintiffs and the class members' businesses;

(h)    misrepresenting the size and reach of the ClassPass Partner Network to convince businesses or entities to partner with ClassPass;

(i)    misrepresenting the size and reach of the ClassPass Partner Network to advertise corporate wellness programs to major corporations, which may purchase ClassPass memberships for their employees;

(j)    harming the reputations of Plaintiffs and the class members by falsely affiliating them with ClassPass; and

(k)    stealing potential customers from Plaintiffs and the class members by diverting them to purchase ClassPass memberships instead of transacting directly with Plaintiffs and the class members.

236.   The false and misleading statements and omissions described are intended to have an impact on whether consumers become ClassPass Subscribers, on

whether businesses choose to join the ClassPass Partner Network, and whether corporations will adopt a ClassPass corporate-welfare program.

237.    The false and misleading statements and omissions described herein actually deceive or have the tendency to deceive customers of Plaintiffs and class members.

238.    Defendants' conduct, as described herein, constitutes a violation of the Lanham Act § 43(a), 15 U.S.C. § 1125(a).

239.    As a direct and proximate result of Defendants' violation and false and misleading statements and omissions described herein, pursuant to 15 U.S.C. § 1117, Plaintiffs and the class members have been, or are likely to be, damaged. Plaintiffs and the Classes are likewise entitled to recover from Defendants all profits, gains and advantages obtained stemming from this improper conduct.

240.    Pursuant to 15 U.S.C. § 1117, Plaintiffs are further entitled to recover the costs of this action. Defendants' conduct was intentional, characterized by an evil motive, and with the design of deceiving the general public to unfairly reap profits at the expense of Plaintiffs and the Classes, entitling Plaintiffs to a statutory multiplier of actual damages, additional damages and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION

**False Advertising in Violation of Section 43 of the Lanham Act,
15 U.S.C. § 1125(a)
(On Behalf of Plaintiffs and the Nationwide Class)**

241.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

242.    Defendants' conduct as set forth herein significantly impacts interstate commerce and commerce within this district.

243.    As described more fully herein, Defendants have engaged in a course of conduct with respect to the advertising of its ClassPass Partner Network that contains false and/or misleading statements of fact, or omissions of critical facts, including those about Plaintiffs and class members, which did not actually partner with ClassPass.

244.    These false and/or misleading statements, or omissions of material facts, include, but are not limited to, the following:

(a)    confusing, or likely confusing, potential customers of Plaintiffs and the class members as to Plaintiffs and the class members' affiliation with ClassPass and the ability to use ClassPass to book their services;

(b)    misrepresenting that Plaintiffs and the class members have partnered with ClassPass and are part of ClassPass's Partner Network;

(c)    misrepresenting that the services offered by Plaintiffs and the class members may be booked through ClassPass;

(d)    misrepresenting the schedules of services and availability of appointments offered by Plaintiffs and the class members;

(e)    misrepresenting the size and reach of the ClassPass Partner Network to entice individuals to purchase ClassPass memberships;

(f)    failing to inform ClassPass Subscribers that Plaintiffs and the class members are in no way affiliated with the ClassPass Partner Network;

(g)     failing to inform ClassPass Subscribers that ClassPass credits cannot be used to pay for services rendered at Plaintiffs and the class members' businesses;

(h)     misrepresenting the size and reach of the ClassPass Partner Network to convince businesses or entities to partner with ClassPass;

(i)     misrepresenting the size and reach of the ClassPass Partner Network to advertise corporate-wellness programs to major corporations, which may purchase ClassPass memberships for their own employees;

(j)     harming the reputations of Plaintiffs and the class members by falsely affiliating them with ClassPass; and

(k)     stealing potential customers from Plaintiffs and the class members by diverting them to purchase ClassPass memberships instead.

245.   The false and misleading statements and omissions described herein are intended to have an impact on whether consumers subscribe to ClassPass memberships, on whether businesses choose to join the ClassPass Partner Network, and whether corporations will adopt a ClassPass corporate-wellness program.

246.   The false and misleading statements and omissions described herein actually deceive or have the tendency to deceive customers of Plaintiffs and the class members.

247.   Defendants' conduct as described herein constitutes a violation of the Lanham Act § 43(a), 15 U.S.C. § 1125(a).

248.    As a direct and proximate result of Defendants' violation and false and misleading statements and omissions described herein, pursuant to 15 U.S.C. § 1117, Plaintiffs and the Classes have or are likely to be damaged. Plaintiffs and the Classes are likewise entitled to recover from Defendants all profits, gains and advantages obtained stemming from this improper conduct.

249.    Pursuant to 15 U.S.C. § 1117, Plaintiffs are further entitled to recover the costs of this action. Defendants' conduct was intentional, characterized by an evil motive, and with the design of deceiving the general public to unfairly reap profits at the expense of Plaintiffs and the Classes, entitling Plaintiffs to a statutory multiplier of actual damages, additional damages and reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION

**Violations of the New York Deceptive and
Unfair Trade Practices Act, N.Y. Gen. Bus. Law § 349
(On Behalf of Plaintiffs and the Nationwide Class)**

250.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

251.    Defendant ClassPass was founded and is headquartered in New York, New York.

252.    ClassPass's terms of service—which Plaintiffs and the class members did not agree to—is governed by New York law and mandates that any suit be brought in this State.

253.    Being located in New York and New York City were and are instrumental in ClassPass's past and continued growth. As Defendant Kadakia explained in a December 12, 2019 interview with CSQ Magazine:

> ***Due to New York's emergence as a tech and innovation hub*** in recent years, Kadakia says, a huge influx of new studios are opening all over the Big Apple. And, she points out, studio owners are entrepreneurs, too. ***The New York market was also vital for gathering feedback during the early days***, and L.A., a hub for health and wellness, was ready to embrace ClassPass as a regular part of the culture.

254.   Defendant Kadakia has also credited ClassPass's early success to getting into TechStar's New York City incubator program in 2012 and credited the "import[ance]" of "getting real world experience" in New York City for ClassPass's success. Kadakia also has boasted that as of June 2012, "We had a million classes listed . . . ***all in New York***."

255.   When Kadakia and Lanman announced the expansion into beauty and wellness industries in February 2018, they began testing the expansion in New York City.

256.   NY GBL § 349 applies to Plaintiffs and other non-New York resident class members because the State of New York has an interest in regulating Defendants' conduct within and emanating from New York and because Defendants' conduct in New York has a broad impact on consumers at large.

257.   Any person who has been injured by reason of any violation of NY GBL § 349 may bring an action in his or her own name to enjoin such unlawful acts or practices, an action to recover their actual damages or $50, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not exceeding three times the actual damages, in addition to $1,000 per

violation, if the court finds that the Defendants willfully or knowingly violated this section. The court may award reasonable attorneys' fees to a prevailing plaintiff.

258.   The practices employed by Defendants, by which they advertise, promote, and market the ClassPass Partner Network were directed to customers and violate GBL § 349.

259.   Plaintiffs and the class members have been injured by Defendants' deceptive acts or practices.

260.   Plaintiffs and the class members have no adequate remedy at law.

261.   Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Classes, and will continue to both damage Plaintiffs and the Classes and deceive the public unless enjoined by this Court.

## FOURTH CAUSE OF ACTION

### False Advertising in Violation of N.Y. Gen. Bus. Law § 350
### (On Behalf of Plaintiffs and the Nationwide Class)

262.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

263.   Defendant ClassPass was founded and is headquartered in New York, New York.

264.   ClassPass's terms of service—which Plaintiffs and the class members did not agree to—are governed by New York law and mandates that any suit be brought in this State.

265.   Being located in New York and New York City were and are instrumental in ClassPass's past and continued growth. As Defendant Kadakia explained in a December 12, 2019 interview with CSQ Magazine:

> **Due to New York's emergence as a tech and innovation hub** in recent years, Kadakia says, a huge influx of new studios are opening all over the Big Apple. And, she points out, studio owners are entrepreneurs, too. **The New York market was also vital for gathering feedback during the early days**, and L.A., a hub for health and wellness, was ready to embrace ClassPass as a regular part of the culture.

266.   Defendant Kadakia has also attributed ClassPass's early success to getting into TechStar's New York City incubator program in 2012 and credited the "import[ance]" of "getting real world experience" in New York City for ClassPass's successes. Kadakia also has boasted that as of June 2012, "We had a million classes listed . . . **all in New York**."

267.   When Kadakia and Lanman announced the expansion into beauty and wellness industries in February 2018, they began testing the expansion in New York City.

268.   NY GBL § 350 applies to Plaintiffs and other non-New York resident class members because New York has an interest in regulating Defendants' conduct within and emanating from New York and because this New York conduct has a broad impact on consumers at large.

269.   By reason of the acts set forth above, Defendants have been and are engaged in consumer-oriented advertising and marketing in the conduct of their

business, trade and/or commerce that is false and misleading in material respects, in violation of Section 350 of the New York General Business Law.

270.   Defendants caused to be disseminated throughout New York State and elsewhere, through advertising, marketing, and other publications, statements that were untrue or misleading, and which they knew to be untrue or misleading.

271.   Defendants' misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers were and continue to be exposed to Defendants' material misrepresentations.

272.   Plaintiffs and the class members have been injured by Defendants' deceptive acts or practices.

273.   Plaintiffs and the class members have no adequate remedy at law.

274.   Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Classes and will continue to both damage Plaintiffs and the Classes and deceive the public unless enjoined by this Court.

275.   Pursuant to NY GBL § 350-e, Plaintiffs and the Classes seek monetary damages (including actual damages or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to NY GBL § 350-a(1)), injunctive relief, restitution, and disgorgement of all monies obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## FIFTH CAUSE OF ACTION

### Common Law Unfair Competition
### (On Behalf of Plaintiffs and the Nationwide Class)

276.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

277.    As described herein, Defendants have engaged in a course of conduct with respect to the advertising of its ClassPass Partner Network that unfairly and falsely affiliates Plaintiffs and class members with Defendants, diverting potential customers into purchasing ClassPass memberships instead of directly purchasing services from Plaintiffs and the class members.

278.    By misappropriating and trading upon the goodwill and business reputation of Plaintiffs and the class members, Defendants have acted in bad faith and have been unjustly enriched, and will continue to do so, unless enjoined by this Court.

279.    Defendants' wrongful conduct constitutes unfair competition under common law. Plaintiffs and the Classes have no adequate remedy at law.

280.    Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Classes and will continue to damage them and deceive the public unless enjoined by this Court.

## SIXTH CAUSE OF ACTION

### Violation of the New Jersey Unfair Competition Act, N.J.S.A. § 56:4-1
### (On Behalf of Plaintiffs Leeah Nails and Salon Phoenix
### and the New Jersey Class)

281.    Plaintiffs Leeah Nails and Salon Phoenix incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

282.   Defendants' appropriation of the business names, lists of services, and goodwill of Leeah Nails, Salon Phoenix, and the New Jersey Class in connection with Defendants' sales and marketing of ClassPass memberships and corporate-wellness programs, violates the New Jersey Unfair Competition Act, N.J.S.A. § 56:4-1.

283.   Plaintiffs Leeah Nails, Salon Phoenix, and the New Jersey Class members have been injured by Defendants' deceptive acts or practices.

284.   Plaintiffs and the class members have no adequate remedy at law.

285.   Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the class members and will continue to both damage Plaintiffs and the class members and deceive the public, unless enjoined by this Court.

### SEVENTH CAUSE OF ACTION

**Violation of the Connecticut Unfair Trade Practices Act,
Gen. Stat. §§42-110a *et seq.*
(On Behalf of Plaintiff Rapha Massage and the Connecticut Class)**

286.   Plaintiff Rapha Massage incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

287.   Defendants' appropriation of the business names, lists of services, and goodwill of Plaintiff Rapha Massage and the Connecticut Class in connection with Defendants' sales and marketing of ClassPass memberships and corporate-wellness programs, violates the Connecticut Unfair Trade Practices Act, Gen. Stat. §§42-110a *et seq.*

288.   Plaintiff Rapha Massage and the Connecticut Class have suffered ascertainable losses by Defendants' unfair and deceptive acts or practices.

289.   Plaintiff Rapha Massage and the Connecticut Class have no adequate remedy at law.

290.   Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiff Rapha Massage and the Connecticut Class will continue to both damage Plaintiff and the Connecticut Class and deceive the public, unless enjoined by this Court.

## EIGHTH CAUSE OF ACTION

**Violation of the Utah Unfair Competition Act,**
**Utah Code Ann. § 13-5a-103(a), *et seq.***
**(On Behalf of Plaintiff Midvalley Massage and the Utah Class)**

291.   Plaintiff Midvalley Massage incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

292.   Defendants' appropriation of the business names, lists of services, and goodwill of Plaintiff Midvalley Massage and the Utah Class in connection with Defendants' sales and marketing of ClassPass memberships and corporate-wellness programs, constitutes unfair competition and violates the Utah Unfair Competition Act, Utah Code Ann. § 13-5a-103(a), *et seq.*

293.   Plaintiff Midvalley Massage and the Utah Class have been injured by Defendants' unfair competition.

294.   Plaintiff Midvalley Massage and the Utah Class have no adequate remedy at law.

295.   Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiff Midvalley Massage and the Utah Class and will

continue to both damage Plaintiff Midvalley Massage and the Utah Class and deceive the public, unless enjoined by this Court.

## NINTH CAUSE OF ACTION

### Violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101, *et seq.* (On Behalf of Plaintiff Salon Goldyn and the Colorado Class)

296.    Plaintiff Salon Goldyn incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

297.    Defendants' knowing appropriation of the business names, lists of services, and goodwill of Plaintiff Salon Goldyn and the Colorado Class in connection with Defendants' sales and marketing of ClassPass memberships and corporate-wellness programs, constitutes a deceptive trade practice and violates the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101, et seq.

298.    Defendants' deceptive trade practices occurred in the normal course of Defendants' business.

299.    Defendants' deceptive trade practices significantly impact the public in deceptively misrepresenting to ClassPass Subscribers and members of the public that Plaintiff Salon Goldyn and the Colorado Class have any connection, affiliation, or association with ClassPass.

300.    Plaintiff Salon Goldyn and the Colorado Class have been injured by Defendants' deceptive trade practices.

301.    Plaintiff Salon Goldyn and the Colorado Class have no adequate remedy at law.

302.   Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiff Salon Goldyn and the Colorado Class and will continue to both damage Plaintiff Salon Goldyn and the Colorado Class and deceive the public, unless enjoined by this Court.

## TENTH CAUSE OF ACTION

**Violation of the California Unfair Competition Law, California Unfair Competition Law ("UCL"), Business & Professions Code, § 17200, *et seq.* (On behalf of Plaintiff Hairroin Salon and the California Class)**

303.   Plaintiff Hairroin Salon incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

304.   Defendants' knowing appropriation of the business names, lists of services, and goodwill of Plaintiff Hairroin Salon and the California Class in connection with Defendants' sales and marketing of ClassPass memberships and corporate-wellness programs, violates the UCL.

305.   Defendants' deceptive trade practices occurred in the normal course of Defendants' business.

306.   Defendants' deceptive trade practices significantly impact the public in deceptively misrepresenting to ClassPass Subscribers and members of the public that the Plaintiff and the California Class have any connection, affiliation, or association with ClassPass.

307.   Plaintiff Hairroin Salon and the California Class have suffered injury in fact as a result of Defendants' deceptive trade practices.

308.   Plaintiff Hairroin Salon and the California Class have no adequate remedy at law.

309.   Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiff Hairroin Salon and the California Class and will continue to both damage Plaintiff and the California Class and deceive the public, unless enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, pray for relief and judgment against Defendants as follows:

A.   certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

B.   awarding Plaintiffs and the Classes compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

C.   awarding Plaintiffs and the Classes appropriate relief, including actual and statutory damages;

D.   for punitive damages;

E.   for civil penalties;

F.   for declaratory and equitable relief, including restitution and disgorgement;

G.   for an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

H.   awarding Plaintiffs and the Classes the costs of prosecuting this action, including expert witness fees;

I.      awarding Plaintiffs and the Classes reasonable attorneys' fees and costs
        as allowable by law;

J.      awarding pre-judgment and post-judgment interest; and

K.      granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 23, 2021

**POLLOCK COHEN LLP**

By: */s/ Raphael Janove*
Raphael Janove
Adam Pollock
Agatha M. Cole
60 Broad St., 24th Fl.
New York, NY 10004
(212) 337-5361
Rafi@PollockCohen.com
Adam@PollockCohen.com
Agatha@PollockCohen.com

**BONI, ZACK & SNYDER LLC**

Michael J. Boni (*pro hac vice* forthcoming)
Joshua D. Snyder (*pro hac vice* forthcoming)
Benjamin J. Eichel (*pro hac vice* forthcoming)
15 St. Asaphs Road
Bala Cynwyd, PA 19004
(610) 822-0200
mboni@bonizack.com
jsnyder@bonizack.com
beichel@bonizack.com

*Attorneys for Plaintiffs and the*
*Proposed Classes*